666 P.2d 83

Jack DUNLAP and Peggy Dunlap, husband and wife, Plaintiffs/Appellees,

v.

JIMMY GMC OF TUCSON, INC., dba Jimmy Recreational Center, an Arizona corporation, Defendant/Appellant.

No. 2 CA–CIV 4288.

Court of Appeals of Arizona, Division 2.

March 8, 1983.

Rehearing Denied Apr. 14, 1983.

Review Denied June 8, 1983.

Alpert & Fein, P.C. by James A. Fein and Mark M. Rubiner, Tucson, for plaintiffs/appellees.

Johnson, Dowdall & Payne by Richard J. Dowdall and Daniel H. Parks, Tucson, for defendant/appellant.

## OPINION

HATHAWAY, Judge.

This appeal arises from an action brought against the appellant, Jimmy GMC, as a third party defendant in a case originally filed against Jack and Peggy Dunlap, the third party plaintiffs. The original plaintiff was Citicorp, a finance company which filed suit against the Dunlaps for repossession of two vehicles and recovery of a deficiency judgment. The vehicles had been sold to the Dunlaps by Jimmy GMC. The Dunlaps filed the third party complaint against Jimmy and Neonex, the manufacturer of the vehicles, alleging breach of contract, breach of express and implied warranties, fraud, consumer fraud, and violation of the Magnusson-Moss Act. Arguing that the third party complaint constituted improper third party practice, Neonex made a pretrial motion to dismiss which was denied. At trial, both Neonex and Jimmy joined in a motion for a directed verdict on the same grounds and that motion was also denied. The case proceeded to trial on the third party complaint after Citicorp reached a settlement with the Dunlaps. The jury returned a verdict in favor of the Dunlaps and against Neonex in the

amount of $35,000 in compensatory damages and $300,000 in punitive damages, and against Jimmy in the amount of $45,000 in compensatory damages and $250,000 in punitive damages. Jimmy appeals from that judgment after denial of its motion for a judgment n.o.v. or, in the alternative, a new trial.

Viewing the evidence in the light most favorable to sustaining the verdict, the following facts were established. The Dunlaps initially became interested in purchasing a Dreamer Recreational Vehicle and a Husky Tow Vehicle when they saw the vehicles advertised in an R.V. newspaper. While driving past Jimmy Recreational Center, they noticed a Husky Tow Vehicle on display and stopped to talk to a sales representative. The Dunlaps informed the salesman that they required a vehicle which could provide year-round permanent living quarters and which was well-insulated since they would live in both warm and cold climates. The salesman pointed out this feature in a brochure. The Dunlaps determined that the Dreamer would suit their needs and returned to Jimmy to "try and make a deal."

Jimmy did not have a Dreamer vehicle on the lot, and because the Dunlaps desired to inspect the vehicle before committing to such a large purchase, they initially decided to purchase only the Husky Tow Vehicle since it was compatible with the recreational vehicle they currently owned. They entered into a sales contract entitled Purchase Money Security Agreement with Jimmy on August 8, 1978. The next day, the Dunlaps entered into a second Purchase Money Security Agreement which replaced the first one and provided for a larger down payment. On August 10, the Dunlaps entered into a third Purchase Money Security Agreement for the purchase of both the Husky and the Dreamer after a salesman promised them that doing so would save a lot of money and headaches. Unlike the first and second agreements, this one did not provide for an extended three year warranty but instead contained a disclaimer by Jimmy of all express and implied warranties. However, Neonex did provide a full one year warranty and Jimmy was authorized by Neonex to perform warranty work on the vehicles. Citicorp then became the assignee of the Purchase Money Security Agreement.

When the Dreamer arrived at Jimmy's lot in Tucson, the Dunlaps went to inspect it and immediately noticed several problems with the vehicle. However, they were assured by Jimmy's personnel that they should not worry because everything "will be taken care of," and they accepted delivery of the Dreamer. Jimmy had also promised the Dunlaps that a factory representative would teach them how to use the special features of the Dreamer but such a person was never produced. Shortly after delivery, the Dunlaps became aware of several more problems with both the Dreamer and the Husky. They were again assured by Jimmy that the problems would be remedied. Although Jimmy personnel tried on several occasions to solve the problems, they were largely unsuccessful, sometimes causing more problems than they cured.

Within two months of delivery, the Dunlaps had noted thirty problems with the Husky and at least fifty-nine problems with the Dreamer, some so serious that the Dreamer was virtually uninhabitable. The Dunlaps sought the advice of an attorney who attempted to make Jimmy remedy the problems. Because they were not satisfied with Jimmy's inept attempts to repair the defects in their vehicles, the Dunlaps next contacted the manufacturer directly. Neonex sent a representative to Tucson to transport the vehicles to California where repairs were to be effected. When the vehicles were redelivered to the Dunlaps in late January, there were still many problems with them. At this point, the Dunlaps' attorney advised them to stop making payments. The attorney's advice was based on a clause in the assignment of the Purchase Money Security Agreement which provided that all defenses available against the seller of the goods were also available against the assignee of the contract. The units were eventually repaired and resold after being repossessed by Citicorp.

Jimmy raises several issues on appeal but none merits reversal.

Jimmy's first allegation of error is that the trial court acted improperly in denying its motion for judgment n.o.v. The case was submitted to the jury on several counts after Jimmy's request for a directed verdict on each count had been denied. The jury returned a general verdict against both Neonex and Jimmy for punitive as well as compensatory damages.

Jimmy argues that judgment n.o.v. should have been granted because the evidence on each count was insufficient to sustain the verdict. Because we find the evidence sufficient to sustain the verdict on at least one count, consumer fraud, we deem it unnecessary to discuss the other counts.

Our resolution of this issue is governed by the following legal principles. First, a motion for judgment n.o.v. should be denied if there is any substantial evidence from which reasonable people could have found the ultimate facts to be such as to sustain the verdict. *In re Estate of Accomazzo,* 16 Ariz.App. 211, 492 P.2d 460 (1972). Second, in reviewing the denial of a motion for judgment n.o.v., we view the evidence in the light most favorable to sustaining the verdict. *Tucson Title Insurance Company v. D'Ascoli,* 94 Ariz. 230, 383 P.2d 119 (1963); *Hurvitz v. Coburn,* 117 Ariz. 300, 572 P.2d 128 (App.1977). Third, a general verdict will be upheld when several counts, issues or theories are submitted to the jury if evidence on one count, issue or theory is sufficient to sustain the verdict. *Reese v. Cradit,* 12 Ariz.App. 233, 469 P.2d 467 (1970).

In its reply brief, Jimmy asserts that this third legal principle is inapplicable because it moved for a directed verdict as to each count and, thus, there must be sufficient evidence presented on every count to sustain the verdict. In support of this argument, it cites *Reese v. Cradit,* supra, specifically in connection with the breach of express warranty count, contending that it was prejudicial error to submit this count to the jury because it is impossible to tell from the general verdict whether the jury awarded any damages on the basis of that count. We disagree.

*Reese* stands for the proposition that a general verdict will not be disturbed if it is supported by evidence sufficient to sustain the verdict on at least one count. In *Reese,* we did not decide the effect of a motion for a directed verdict on a general verdict supportable by evidence on at least one count where one or more other counts are unsupported.

We now decide that issue and find that the appellant's motion for directed verdicts does not warrant a different result. While there is authority to the contrary, *Dillon v. Barnard,* 328 Mass. 53, 101 N.E.2d 345 (Mass.1951), we agree with the statement of the court in *Jenkins v. Chicago & Eastern Illinois Railroad,* 5 Ill.App.3d 954, 284 N.E.2d 392 (1972):

" . . . where several causes of action have been alleged and a general verdict results, the verdict will be sustained against a general motion for directed verdict . . . if there are one or more good causes of action or counts to support it." 284 N.E.2d at 397.

We note that here appellant made separate motions as to each cause of action and not a general one. However, we believe that this is a distinction without any difference.

Adoption of this rule might appear to have the potential of causing injustice to the defendant. However, the remedy is always in the hands of defense counsel. We believe it proper to place the burden of requesting special verdicts after a motion for a directed verdict has been denied on defense counsel rather than on counsel for the plaintiff.

A request for special verdicts would have been the proper method of assuring that the award of damages was not partly based on a count which had been erroneously submitted to the jury. Not having asked for special verdicts, Jimmy will not be heard to challenge the validity of the general verdict, the jury having been presented with ample evidence to sustain the award of

damages on at least the consumer fraud count.

■ The Consumer Fraud Act provides an injured consumer with an implied private cause of action against a violator of the act. *Sellinger v. Freeway Mobile Home Sales, Inc.,* 110 Ariz. 573, 521 P.2d 1119 (1974). The elements of a private cause of action under the act are a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury. *Parks v. Macro-Dynamics,* 121 Ariz. 517, 591 P.2d 1005 (App.1979). We find the record contains sufficient evidence as to each of these elements to sustain the jury's verdict on both punitive and compensatory damages.

■ The Dunlaps informed Jimmy's sales representative that they required a well-insulated unit which would be comfortable and economical in both warm and cold climates. Jimmy's salesman assured them that the Dreamer would suit their needs. Although a disclaimer contained in the third Purchase Money Security Agreement may preclude a claim under the act against Jimmy for misrepresentation in connection with the distribution of brochures to the Dunlaps, the record contains evidence that supports a finding that Jimmy made misrepresentations in the form of assurances to the Dunlaps that the Dreamer would satisfy their requirement that the unit be well-insulated, and that Jimmy would remedy all the defects in the Dreamer. These assurances were made to the Dunlaps prior to, as well as after, their acceptance of delivery. Thus, the jury could have determined that the misrepresentations were made in connection with the sale of merchandise and the Dunlaps were thereby damaged.

Jimmy contends that liability for consumer fraud is precluded by the disclaimer clause contained in the Purchase Money Security Agreement when read with another clause providing that the Purchase Money Security Agreement constitutes the entire agreement between the parties. In support of this contention, Jimmy cites *Kalil Bottling Co. v. Burroughs Corp.,* 127 Ariz. 278,

619 P.2d 1055 (App.1980). This court, in *Kalil,* determined that the parol evidence rule precluded a claim of consumer fraud because the sales contract contained a clause expressly stating that no understandings, agreements, representations or warranties existed between the parties and that the contract itself stated the entire obligation of the seller in connection with the transaction.

Unlike *Kalil,* the disclaimer clause between Jimmy and the Dunlaps did not expressly limit Jimmy's obligations by the terms of the agreement nor did it state that Jimmy made no representations. The representations made by Jimmy as to the suitability of the insulation and climate control qualities of the Dreamer are not contradictory to the express terms of the Purchase Money Security Agreement, and are therefore not precluded by the parol evidence rule.

■ Viewed in the light most favorable to sustaining the verdict, we find that substantial evidence was presented on the consumer fraud count from which the jury could have found liability. The trial court properly denied Jimmy's motion for judgment n.o.v.

■ Jimmy next alleges that the trial court erred in instructing the jury on punitive damages and in refusing its motion for judgment n.o.v. on the issue of punitive damages. This contention is based on language in *Peery v. Hansen,* 120 Ariz. 266, 585 P.2d 574 (App.1978), that a "private individual's relief under the Consumer Protection [sic] Act is limited to the recovery of actual damages suffered as a result of such unlawful act or practice." 120 Ariz. at 270, 585 P.2d 574. In *Peery,* we considered whether, in addition to damages, a private plaintiff may recover an amount equivalent to the $5,000 which the state is authorized to recover in an action brought by the attorney general. Arizona courts have recognized that punitive damages are recoverable in a private cause of action under the Consumer Fraud Act. *Sellinger v. Freeway*

*Mobile Home Sales, Inc.,* supra; *Parks v. Macro-Dynamics,* supra.

In *Sellinger,* the Arizona Supreme Court stated that punitive damages are appropriate where the wrongdoer's conduct is wanton or reckless, shows spite or ill will, or where the conduct demonstrates a reckless indifference to the interests of others. Based on the evidence presented at trial the jury could have concluded that the conduct of Jimmy's personnel met the criteria specified in *Sellinger.* Thus, neither the jury instruction on punitive damages nor the refusal to grant judgment n.o.v. on the issue of punitive damages was improper.

■ The third issue we address is whether the trial court erred in admitting evidence of unethical sales practices on the part of Jimmy, who claims such evidence is irrelevant. Testimony was presented that Jimmy's president had stated it was company policy to run a quick credit check on prospective customers. If the credit check was positive, the salesperson would encourage the prospective customers to trade in their old vehicle while trying out a new one for a few days. Jimmy would then quickly resell the old vehicle, making it necessary for the customer to complete the purchase of the new vehicle. We believe that evidence of past deceptive sales practices is relevant on the issue of whether Jimmy was currently involved in deceptive sales practices and on the issue of punitive damages. We are unpersuaded by Jimmy's argument that the danger of unfair prejudice substantially outweighs the probative value and we defer to the trial court's conclusion to the contrary, there being no showing that it is clearly erroneous. We therefore find the trial court acted properly in admitting evidence of Jimmy's prior unethical sales practices.

■ The fourth issue is whether the trial court should have granted a new trial based on the misconduct of opposing counsel. One alleged act of misconduct involves remarks made by the Dunlaps' attorney during his opening statement, in which he commented that he had been a consumer rights attorney for eight years, that this case in-volved fraud and corruption in the marketplace, and that he had known the name "Jimmy" (his own first name) for quite a while in his life. The trial court determined that although these comments were improper, they were not so prejudicial as to warrant a mistrial.

■ A second allegation of misconduct involves comments made by the Dunlaps' attorney to a television news reporter after the first day of trial. After reviewing a transcript of the newscast, the trial judge ruled that the newscast did not constitute the kind of overwhelming publicity that would prejudice the jury to the extent that a mistrial would be warranted. The trial judge is in the best position to determine whether the improper conduct actually influenced the verdict and his decision will not be overturned unless there is an abuse of discretion. *Anderson Aviation Sales Company, Inc. v. Perez,* 19 Ariz.App. 422, 508 P.2d 87 (1973). See also, *Porterie v. Peters,* 111 Ariz. 452, 532 P.2d 514 (1975). We find no abuse of discretion.

We must next determine whether the trial court properly instructed the jury that the plaintiff had the burden of proving consumer fraud by a preponderance of the evidence. Jimmy argues that in an action based on the Consumer Fraud Act, the jury should be instructed that the plaintiff is required to prove his claim by clear and convincing evidence, the same degree of proof required for common law fraud. The basis for Jimmy's argument is that the elements required to prove a consumer fraud claim have already been relaxed from those required to prove common law fraud and the higher degree of proof is necessary to protect defendants in consumer fraud actions from harassment.

■ Jimmy has cited no authority, and we have found none, to support this contention. In Arizona, common law fraud must be proved by clear and convincing evidence. *General Accident Fire & Life Assur. Corp. v. Little,* 103 Ariz. 435, 443 P.2d 690 (1968). This, however, is not a case of common law fraud. Consumer fraud is a cause of action

which is separate and distinct from common law fraud. *Murray v. Western American Mortgage Company,* 124 Ariz. 387, 604 P.2d 651 (App.1979). The mere fact that the word "fraud" appears in the title of our consumer protection statute does not give rise to an inference that the legislature intended to require a higher degree of proof than that ordinarily required in civil cases.[1]

The purpose of legislation such as Arizona's Consumer Fraud Act is to provide a remedy for injured consumers who need such protection to counteract the disproportionate bargaining power which is typically present in consumer transactions. The legislative intent behind the Consumer Fraud Act is to provide consumers with a claim for relief that is easier to establish than is common law fraud. To require the higher degree of proof would frustrate the legislative intent.

Moreover, the instruction conforms to the standard civil jury instruction embodied in R.A.J.I. Stand. 9.75 Am.Jur.2d, Trials, § 822, states "[i]t is a well-settled and firmly intrenched [sic] doctrine that the issues of fact in civil cases must be determined in accordance with the preponderance or weight of the evidence ... " See also, 88 C.J.S., Trial, § 366. The legislature has not expressly required the statutory cause of action to be proved by clear and convincing evidence. Unless the legislature speaks otherwise and absent authority to the contrary, we presume a jury instruction given in conformance with the standard civil jury instructions was proper.

A "preponderance of the evidence" instruction effectuates the legislative intent by affording maximum protection to injured consumers; it is consistent with the general rule that civil cases must be proved by a preponderance of the evidence; and Jimmy has cited no authority in support of its contention that a higher degree of proof

is required. For these reasons, we find the jury was properly instructed.

Jimmy next argues that the trial court should have granted a new trial because the jury returned inconsistent verdicts. The jury returned a general verdict against both defendants for compensatory and punitive damages. The mere fact that the amounts awarded against each defendant differed does not mean the verdicts are inconsistent. We are unable to discern any inconsistencies in the verdicts and find this argument devoid of merit.

The final question is whether the trial court erred in refusing to dismiss the third party complaint on the basis that it constituted improper third party practice under Rule 14, Arizona Rules of Civil Procedure. Jimmy makes the bare assertion that it was prejudicial to allow the claim to go to trial on the third party complaint. Prejudice in a civil trial will not be presumed but must affirmatively appear from the record. *Rimondi v. Briggs,* 124 Ariz. 561, 606 P.2d 412 (1980). Whether or not the trial court acted properly in refusing to dismiss the third party complaint, there is no evidence whatsoever that Jimmy was prejudiced.

Jimmy has raised two additional issues on appeal, one dealing with the Magnusson-Moss Act and one concerning the breach of warranty claim. However, because of the disposition of this appeal, we find it unnecessary to decide these issues.

Affirmed.

BIRDSALL and HATHAWAY, JJ., concur.

HOWARD, Chief Judge, dissenting.

As Oliver Hardy said to Stan Laurel, "This is a fine kettle of fish you've gotten us into." This is what comes when the court implies a private right of action under a statute when the legislature never intend-

---

1. Consumer legislation in other jurisdictions providing protection similar to that afforded by Arizona's Consumer Fraud Act carries a variety of titles, e.g., Maine Unfair Trade Practices Act, 5 M.R.S.A. §§ 206–214; Unfair Trade Practices and Consumer Protection Act, A.S. 45.50.471 et seq. (Alaska); Deceptive Trade Practices-Consumer Protection Act, V.T.C.A. Bus. & Com. § 17.41 et seq. (Texas); Unlawful Trade Practices Act, O.R.S. 646.605 et seq. (Oregon).

ed one to exist. As I expressed in my concurring opinion in *Peery v. Hansen*, 120 Ariz. 266, 585 P.2d 574 (App.1978) you can kiss common law fraud "goodbye" in this state. As a direct result of *Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 521 P.2d 1119 (1974) and this case, in any action involving a sale of property, whether personal or real, in which fraud is alleged, the plaintiff need not show any reliance and need only prove his case by a preponderance of the evidence instead of the normal clear and convincing standard used in common law fraud cases. Do we really want to do this?

The fault lies with *Sellinger*, which put misplaced reliance on an Illinois case involving an Illinois statute, misconstrued the Illinois statute and the Illinois case, misconstrued A.R.S. § 44–1533, and failed to conduct the type of analysis in which the court should engage in deciding whether or not a private cause of action exists under a statute. The case of *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) involved a derivative action on behalf of trust shareholders under the Investment Advisers Act of 1940 for breach of fiduciary duty and fraud. The Court stated:

"The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction. [citations omitted.] While some opinions of the Court have placed considerable emphasis upon the desirability of implying private rights of action in order to provide remedies thought to effectuate the purposes of a given statute, ... what must ultimately be determined is whether Congress intended to create the private remedy asserted, as our recent decisions have made clear. [citations omitted.] We accept this as the appropriate inquiry to be made in resolving the issues presented by the case before us." 444 U.S. at 15–16, 100 S.Ct. at 245.

The Court found that, since one section of the act provided that certain contracts "shall be void" but the act did not provide how they were to be voided, the section by its terms necessarily contemplates that the issue of voidness must be litigated somewhere and that obviously Congress must have meant that the common law legal incidence of voidness would follow, including the availability of a suit for rescission or for injunction against the continued operation of the contract and for restitution. It therefore concluded that private persons who entered into such contracts could maintain an action to void them. However, it held that the question of damages was quite different:

"... Yet is is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. 'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.' [citations omitted.] Congress expressly provided both judicial and administrative means for enforcing compliance with § 206. First, under § 217, 15 U.S.C. § 80b–17, willful violations of the Act are criminal offenses, punishable by fine or imprisonment, or both. Second, § 209 authorizes the Commission to bring civil actions in federal courts to enjoin compliance with the Act, including, of course, § 206. Third, the Commission is authorized by § 203 to impose various administrative sanctions on persons who violate the Act, including § 206. In view of these express provisions for enforcing the duties imposed by § 206, it is highly improbable that 'Congress absentmindedly forgot to mention an intended private action.' [citation omitted.]" 444 U.S. at 19–20, 100 S.Ct. at 246–247.

Our act states that the attorney general is to enforce its provisions. The rationale of *Transamerica* applies. It is improbable that the state legislature absentmindedly forgot to mention an intended private action. If it wanted to put one in, it could have done so in simple and express language. The dispositive question is whether the state legislature intended to create a private remedy. It did not.

It might be a good idea to read our own statute a little closer. A.R.S. § 44–1522(A) sets forth unlawful practices. Subsection B involves the intended interpretation of the provisions of subsection A. It states:

"It is the intent of the legislature that, in construing the provisions of subsection A of this section, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to §§ 45, 52 and 55(a)(1) Title 15, U.S.C.A. of the federal trade commission act...."

There is no private cause of action under the federal act. See *Carlson v. Coca-Cola Company,* 483 F.2d 279 (9th Cir.1973). A.R.S. § 44–1524 sets forth the elaborate powers of the attorney general under the consumer fraud act. There follow other sections dealing with confidentiality, the subpoena power, contempt powers, what can be done when there is assurance of a discontinuance of an unlawful practice and the establishment of a revolving consumer protection fraud fund. As was stated by the Court in *Middlesex County Sewerage Authority v. National Sea Clammers,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981):

"In view of these elaborate enforcement provisions it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing .... As we stated in Transamerica Mortgage Advisers, supra, 'it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.' [citations omitted.] In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." 453 U.S. at 14–15, 101 S.Ct. at 2623.

There is no strong indicia of contrary legislative intent here and we should be compelled to conclude that the legislature provided precisely what it considered appropriate, as was the Supreme Court of the United States.

Now to get to § 44–1533. It provides, inter alia, the following: "The provisions of this article shall not bar any claim against any person who has acquired any monies or property, real or personal, by means of any practice declared to be unlawful by this article."

The court in *Sellinger* held that the inference from this provision was that there was a private cause of action under the act. In my opinion it says nothing of the kind. All it says is that if a person commits an act which would be fraudulent under the Consumer Fraud Act, he cannot, as a defense to a common law suit for fraud and deception, claim that the only one who can sue him is the attorney general. That is all that the statute says.

If the court insists in giving private individuals a right to bring a lawsuit under the act, it should limit these suits as was done by the Washington court in *Lightfoot v. MacDonald,* 86 Wash.2d 331, 544 P.2d 88 (1976). There the court held that private individuals could act as private attorneys general and bring a suit under the act but only in those cases where the act complained of affected a public interest. In those cases where there is merely a breach of a private contract affecting no one but the parties to the contract, there is no right to bring a private cause of action under the act. Thus, if we were to employ the Washington rationale, the appellees here would have had no right to bring a private action under the act since the matter was a private one and did not affect a public interest.

I believe that there was a jury question as to whether or not the appellant made an independent warranty concerning the trailer and that, the jury having resolved this, appellees should be entitled to the compensatory damages for breach of warranty. However, they are not entitled to punitive damages.