9 P.3d 1088

**Brian MURCOTT and Mary Murcott, husband and wife, Plaintiffs–Appellees, Cross Appellants,**

v.

**BEST WESTERN INTERNATIONAL, INC., an Arizona corporation; Mark T. Brown, Loren H. Unruh, Rodger Mathis and David L. Huff, Sr., Defendants–Appellants, Cross Appellees.**

No. 1 CA–CV 99–0494.

Court of Appeals of Arizona, Division 1, Department E.

Aug. 31, 2000.

As Amended Oct. 16, 2000.

---

**352**

Schleier, Jellison & Schleier, P.C. By Tod F. Schleier, Bradley H. Schleier and Galbut & Conant By Paul A. Conant, Phoenix, Attorneys for Plaintiffs–Appellees, Cross Appellants.

Gust Rosenfeld, P.L.C. By Richard A. Segal, Phoenix, and Ross, Dixon & Bell, L.L.P. By Lewis K. Loss, Terrence R. McInnis, Andrea R. Tebbets, Washington, D.C., Attorneys for Defendants–Appellants, Cross Appellees.

**OPINION**

GERBER, Judge.

¶ 1 Brian Murcott filed an action for wrongful discharge against his former employer, Best Western International, Inc., and four individuals serving as company directors at the time of the discharge: Mark T. Brown, Rodger Mathis, Loren H. Unruh, and David L. Huff. Best Western moved for a directed verdict on liability and on a claim for punitive damages. The trial court denied the motion as to liability and directed a verdict in favor of Best Western on the punitive damages claim.

¶ 2 After the jury found in Murcott's favor, Best Western filed an unsuccessful motion for judgment notwithstanding the verdict, or as it is now termed in revised Rule 50,

Arizona Rules of Civil Procedure, judgment as a matter of law ("JMOL"). Best Western now appeals from the denial of the JMOL motion, and Murcott cross-appeals from the directed verdict on punitive damages. We have jurisdiction over both appeals. *See* Ariz.Rev.Stat. Ann. ("A.R.S.") section 12–2101(B)(1994). The issues raised generally involve the interplay between "whistle-blowing" and at-will discharge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

#### 1. The Parties

¶ 3 Best Western is an Arizona non-profit corporation. Instead of stockholders, it has members who are independent owners and/or operators of its hotels and motels.

¶ 4 During 1994 and 1995, when the events giving rise to this lawsuit occurred, Best Western's seven-member board of directors consisted of the four individual defendants (Brown served as Chairman of the board during 1995), plus three persons not named in this suit: Don Seaton, Fred Walter, and Steve Vande Berg. Murcott joined the company in 1989 as Vice President of Membership Development and Quality Assurance. He did not have a written employment contract and served at the pleasure of the board as an at-will employee.

#### 2. Best Western's Membership Application Process

¶ 5 The board was charged with electing property owners and operators to membership. It met about ten times each year to review and vote on applications. In-house staff would submit a report on each applicant's ownership and management, location, market, facilities and service. Such reports included a non-binding recommendation. Board members also would provide input after visiting applicant properties.

¶ 6 According to Murcott, numerous factors entered into the staff's evaluation whether an applicant would be a good candidate for membership, including the property's appearance, its location, the applicant's experi-

ence and whether Best Western was already sufficiently represented in the relevant market. Murcott stated that "the overriding concept" of the application review process was "to decide what is in the best interests of the association as a whole."

### 3. The Seven Contested Applications

¶ 7 At trial, Murcott identified seven instances during 1994–95 in which he disagreed, on anti-trust grounds, with the Board's handling of an actual or prospective application. These instances are described below.

### a. Valle, Arizona (Grand Canyon Motel)

¶ 8 In March 1994, the Grand Canyon Motel in Valle, Arizona applied for membership. Best Western already had a member hotel in the Grand Canyon area, the Grand Canyon Squire Inn. During the course of Best Western's evaluation of the Grand Canyon Motel's application, defendant Brown personally inspected the applicant's property and met with the applicant and the existing Best Western member in the area.

¶ 9 Best Western staff had recommended a "conditional approval" of the Grand Canyon Motel's application, but at the board meeting at which the application was considered, Brown expressed concerns regarding "points about the [applicant's] property that he didn't like." After consideration, the board voted to reject the Grand Canyon Motel application.

¶ 10 Murcott claimed at trial that he had "serious concerns" regarding defendant Brown's actions in connection with the application. He expressed these concerns to Best Western's legal counsel. Specifically, Murcott believed that Brown departed from company policy when he visited the hotel and met with the existing competing member. He testified that he raised objections with Brown regarding the perceived departure from Best Western's policies at a board meeting at which he also stated that this departure from company policies could "possibly lead to an antitrust lawsuit." The board denied the application based on Brown's motion.

### b. Portland, Maine (Sonesta Hotel)

¶ 11 In August 1994, the Sonesta Hotel in Portland, Maine expressed interest in membership in Best Western. Before the application process got underway, Murcott and defendant Huff visited the hotel to evaluate it. During this visit, both Murcott and Huff met with the owner of the existing Best Western hotel in Portland, who was also a Best Western "governor" for the region.

¶ 12 While Murcott was impressed by the applicant's property, Huff had a negative reaction. According to Murcott, Huff criticized the hotel because it had a number of undersized rooms, rented some rooms on a permanent basis to residents and was near an X-rated movie theater. Murcott also asserted that Huff was concerned with the hotel's impact on another nearby Best Western property. Huff told Murcott that he would not support the application and that he should discourage the hotel from continuing the application process so as not to waste its time. According to Murcott, Huff also stated, "Well, let's say I'm protecting the member." Murcott thereafter advised the applicant that its efforts were futile. The hotel did not pursue the application.

¶ 13 Murcott testified that, in his opinion, Huff's meeting with the existing member in Portland "was outside of the [company's] guidelines." He stated, "I'm not sure that I said anything to him" about the possible violation of company guidelines. When asked whether he had raised any objection to Huff's conduct, Murcott said, "[n]ot in so many words, no," instead expressing his concerns by "long pauses in my conversation and probably the tone of my voice."

### c. Romulus, Michigan (Holiday Inn)

¶ 14 Sometime in 1994, a Holiday Inn in Romulus, Michigan expressed interest in switching its affiliation to Best Western. Recognizing that a new Best Western had just recently opened in the same area, the local director of membership development asked Murcott whether he should even bother pursuing the Holiday Inn. Murcott testified that he advised Huff of the situation, and Huff said that they should give the new Best

Western in the area "a year or two to get that operation up and running." Accordingly, Murcott advised the local director of membership not to pursue the prospect, and the Holiday Inn declined to file a formal application.

¶ 15 Murcott testified that he never raised any objections regarding these circumstances to Huff or anyone else, explaining, "I didn't see any point in that [i.e., in expressing concern or agitation over Huff's actions]." He testified on cross-examination, "I didn't object in terms of expressing it and putting it into words." Instead, he claims that he "sighed," that there were "pauses in the conversation," that the "tone of [his] voice was resigned," and that he believed these nonverbal cues conveyed his purported concerns to Huff.

¶ 16 Murcott also complained about a potential antitrust law violation to Best Western's outside legal counsel, Kenneth Sundlof, who at trial recalled a discussion with Murcott of antitrust concepts. Specifically, they addressed the possibility that a rejected applicant who met the company's requirements could claim that the company had attempted to protect the business of an existing member in violation of antitrust law.

### d. *Page, Arizona*

¶ 17 Sometime in 1994, two applications for Best Western memberships were submitted in Page, Arizona. One application came from the "Weston family," owners of existing Best Western hotels in Page, and another from J.J. Wang. Wang's application was approved by the board; the Weston application was denied. In November 1994, Wang advised Best Western that he was having drainage problems with the proposed site and that he intended to construct his new hotel across the street.

¶ 18 Brown then reopened consideration of the Weston application. Murcott testified that he believed Brown was being swayed by contacts with the Weston family and that this behavior was unfair to Wang. Murcott recalled meeting with Brown in November 1994 to express his objections to the lobbying efforts, telling Brown that his actions were "immoral" and "illegal." Brown admitted at trial that it was possible that Murcott told him that Wang might pursue an antitrust claim.

¶ 19 In January 1995, the board discussed both the Weston and Wang applications. Murcott testified at trial that he reiterated his objections at the board meeting, stating that there was no basis to deny the Wang application. Board member Seaton admitted that Murcott expressed concern that Best Western risked running afoul of federal and state antitrust laws.

¶ 20 The board approved the Weston application in a 4–3 vote. Thereafter, Wang's attorney sent a letter to Best Western complaining about violations of internal policies. The board ultimately decided to let stand its approval of the Wang application.

### e. *Vancouver and Victoria, Canada (Surrey Inn and Coachman Inn)*

¶ 21 In July 1994, the Coachman Inn in Victoria, Canada applied for membership. According to Murcott, defendant Mathis, the director for that region, was unfamiliar with the applicant's property. Other board members suggested that Mathis visit the site to evaluate it personally. According to Murcott, Mathis, after visiting the location, advised the board that he had spoken to a member with a hotel in the area who expressed concerns regarding the economic impact of the Coachman Inn on the existing member's business.

¶ 22 Mathis testified that he recommended that the Board deny the application because he considered the property in question to be highly undesirable in both appearance and location. Murcott addressed the board and protested that Mathis had gone outside Best Western's antitrust policies, was protecting a member and creating an exclusive territory. He also raised concerns about potential antitrust violations with Sundlof. The board declined the Coachman Inn application.

¶ 23 Subsequently, in January 1995, Best Western received an application from the Surrey Inn in Vancouver, Canada, another hotel within Mathis' region. Although the staff recommended "conditional approval" of the Surrey Inn's · application, defendant

Mathis expressed his opinion that the Surrey Inn would negatively affect an existing nearby member, the Best Western Pacific Inn. Murcott acknowledged at trial that the board frequently deferred to the recommendations of the regional director because such local knowledge "is often extremely beneficial in the evaluat[ion of] the applications." The Surrey Inn application was ultimately denied.

¶ 24 Murcott testified, however, that Mathis' actions were "risky on his part." Murcott recalled telling the board, "I felt that he [Mathis] had gone outside Best Western policy in doing this type of thing. I felt that the applications were being denied for improper reasons and that he was protecting the members and thereby creating exclusive territories." Murcott further testified that, regarding the perceived violation of internal company policies, the "implication was that these were antitrust-type violations."

¶ 25 At trial, Mathis acknowledged that Murcott expressed his concern that by denying the application Best Western appeared to be protecting an existing member. Board member Walter agreed that, during a board meeting, Murcott had "vigorously protested" Mathis' recommendation to deny the application.

### f. *Irving, Texas*

¶ 26 In March 1995, Best Western received a membership application for a hotel to be built at the south end of the Dallas–Fort Worth airport in Irving, Texas. Defendant Unruh, the Board member for that region, initially favored the application. With Unruh's support, staff generated a favorable recommendation. Thereafter, according to Murcott, Unruh stated that owners of the Best Western property at the north end of the Dallas airport had expressed concern over the competitive impact of the prospective hotel.

¶ 27 Murcott testified that Unruh inquired whether it would be possible to change the staff recommendation. In response Murcott himself proposed a way to deny the application "without getting into antitrust problems," by telling Unruh that they "could certainly justify saying we need a full-service

hotel with meeting space at the airport and this [*i.e.* the applicant's] was a limited property with only 65 rooms." Based upon this "logical reason to deny the application," Murcott "agreed to change the staff recommendation." The application was then denied.

### 4. *Murcott's Discharge*

¶ 28 Best Western's board decided to fire Murcott during an executive session on July 24, 1995. Best Western claimed at trial that it discharged Murcott and another vice-president, Clay Carpenter, as part of a reorganization effort. Murcott contends that his whistle-blowing activities were a substantial motivating factor in the firing decision.

¶ 29 During the weeks preceding Murcott's termination, Ronald Evans, Best Western's President and Chief Executive Officer, told director Ed Walter that Murcott was being targeted as a scapegoat by the individual defendants who felt he had spoken openly about violations of the company's antitrust policies. Walter testified that Murcott's stance "went against him in the long run." Director Seaton testified that the individual defendants stated that Murcott was not a "team player" regarding antitrust compliance. Director Vande Berg testified that the individual defendants specifically criticized Murcott's position on antitrust compliance at the time of the termination decision.

¶ 30 Murcott also introduced evidence that it was Best Western's practice to notify employees if their job performance was unsatisfactory and to give those employees an opportunity to cure any deficiency. Another company practice was to investigate allegations and obtain a report from the employee's supervisor concerning quality of employee performance. The Board sought no such report from Evans; instead, it summoned Evans into the executive session whereupon Walter informed him of an apparent consensus to terminate Murcott. Walter, Seaton and Vande Berg all opposed the decision.

¶ 31 Evans, who had daily contact with Murcott, also opposed Murcott's termination. He testified that in his fifteen years as Best Western's CEO there had not been another situation—apart from the termination of Car-

penter on the same day—in which a vice president had been discharged without his recommendation.

### B. Procedural Background

¶ 32 Murcott filed an amended complaint against Best Western for wrongful discharge based upon whistle-blowing, free speech violations, and age discrimination, as well as for defamation and tortious interference with contractual relations. Best Western moved for partial summary judgment on the whistle-blowing, free speech, and contract claims. The superior court granted the motion. After a final trial judgment on the remaining counts, Murcott appealed to this court. Pursuant to a stipulation by the parties, the age discrimination and defamation claims were dismissed. We reversed the grant of summary judgment in an unpublished memorandum decision and remanded the matter to the superior court.

¶ 33 On remand, Best Western again moved for summary judgment on the whistle-blowing, free speech and contract claims, and Murcott agreed to dismiss the contract claim. The superior court denied the summary judgment motion as to the whistle-blowing and free speech claims.

¶ 34 A jury trial began with the remaining counts treated as a single whistle-blowing claim. Best Western made an oral motion for a directed verdict on liability, which was denied. The trial court did grant Best Western's oral motion for a directed verdict on punitive damages. The jury returned a verdict in favor of Murcott with damages in the amount of $1.75 million.

¶ 35 Best Western filed a JMOL motion pursuant to Rule 50(a), Ariz. R. Civ. P., which the trial court denied. These appeals followed.

1. Best Western had argued that Murcott did not possess a cause of action for wrongful termination in violation of public policy at the time of his discharge in 1995 because there was no public policy exception to the at-will employment doctrine before the 1996 effective date of the Arizona Employment Protection Act, A.R.S. sec-

## II. DISCUSSION

### A. Standards of Review

¶ 36 The tests for granting a directed verdict and a JMOL motion are the same. *See Times Mirror Co. v. Sisk,* 122 Ariz. 174, 178, 593 P.2d 924, 928 (App.1978). Such motions should be granted only "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme School v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). On appeal from the denial of motions for a directed verdict or JMOL, we view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *See Rocky Mountain Fire & Cas. Co. v. Biddulph Oldsmobile,* 131 Ariz. 289, 292, 640 P.2d 851, 854 (1982).

### B. Best Western's Appeal [1]

¶ 37 Best Western attacks the trial court's decisions on two fronts: (1) as a matter of law, Murcott's evidence of whistle-blowing failed to support a finding of liability, and (2) as a matter of law, Murcott's evidence failed to support the award of emotional distress damages.

1. *As A Matter of Law, Murcott's Evidence of Whistle-blowing Supported the Verdict.*

a. *Murcott's Whistle-blowing Did Serve A Public Purpose.*

¶ 38 According to the public policy exception to the at-will rule, an employer may not fire an employee for a reason against public policy:

> Firing for bad cause—one against public policy articulated by constitutional, statutory or decisional law—is not a right inher-

tion 23–1501. It now concedes, as it must, that the Arizona Supreme Court's decision in *Cronin v. Sheldon,* 195 Ariz. 531, 991 P.2d 231 (1999), precludes further reliance on that argument. Best Western had advanced that argument prior to the issuance of *Cronin.*

ent in the at-will contract, or in any other contract, even if expressly provided.

*Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 381, 710 P.2d 1025, 1036 (1985).

■ ¶ 39 The few Arizona decisions discussing public policy violations for whistleblowing discharges recognize certain essential elements. In *Wagner v. City of Globe*, the Arizona Supreme Court described a whistle-blower as an employee "who exposes wrongdoing on the part of his employer and is then discharged." 150 Ariz. 82, 88, 722 P.2d 250, 256 (1986). For a whistle-blowing employee to succeed on a public policy-based wrongful discharge claim, the court must find "some 'important public policy interest embodied in the law' has been furthered by the whistleblowing activity." *Id.* at 89, 722 P.2d at 257 (quoting *Wagenseller*, 147 Ariz. at 380, 710 P.2d at 1035).[2] The *Wagner* court accordingly reversed summary judgment entered against a discharged police officer who took "affirmative remedial action" by reporting an illegal arrest to a city manager and whose actions were "not merely private or proprietary, but instead [sought] to further the public good." *Id.*

¶ 40 Best Western argues that Murcott's complaints concerning its practices escape the whistle-blowing public policy exception because he admitted that he was merely attempting to protect the company and himself from liability. Best Western further argues that no actual antitrust violations occurred. It points out that the alleged illegal influences at issue in the Page, Arizona applications lacked any anti-competitive effect and that the market actually expanded when it approved the Wang application.

■■ ¶ 41 An actual antitrust violation need not be proven. The *Wagner* decision did not turn on whether a law or regulation had been violated but rather on whether an important public policy interest embodied in the law benefitted from the whistle-blowing. Similarly, *Wagenseller* found that discharge wrongful because the plaintiff refused to participate in illegal behavior. *See* 147 Ariz. at

380, 710 P.2d at 1035. Accordingly, the relevant inquiry here is not whether Best Western committed an actual antitrust violation or how Murcott chose to characterize the company's activities but instead whether Murcott's complaints addressed an important public policy interest.

¶ 42 *Wagenseller* provides guidance about public policy protecting whistle-blowers from wrongful discharge. There the supreme court explained that the matter must " 'strike at the heart of the citizen's social rights, duties and responsibilities.' " 147 Ariz. at 377, 710 P.2d at 1032 (quoting *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876, 878–79 (1981)). Although public policy need not always derive from a criminal statute, *Wagenseller* stated that the criminal code is a clear expression of state public policy. *See id.* at 380, 710 P.2d at 1035.

■ ¶ 43 The Arizona Legislature has enacted a Uniform State Antitrust Act in A.R.S. section 44–1401 (1974) wherein the underlying purpose is to establish a "public policy of first magnitude" in furthering a competitive economy. *See United Nuclear Corp. v. General Atomic Co.*, 93 N.M. 105, 597 P.2d 290, 310 (1979). Arizona's antitrust statutes parallel criminal statutes in some respects. Enforcement of antitrust law is delegated to the state through the Attorney General rather than being reserved to individual parties. The penalties employed go well beyond compensatory and remedial relief. *See* A.R.S. § 44–1407. Moreover, private parties may be entitled to treble damages, a punitive sanction. *See* A.R.S. § 44–1408(B). Accordingly, these laws form a public policy basis for Murcott's claim.

■ ¶ 44 Best Western also argues that Murcott is not entitled to relief because he "covered up" the alleged antitrust violations. For example, Murcott testified that in the Irving, Texas matter, after learning that Unruh wanted to deny an application to protect an existing member, he himself contrived a

---

**2.** *See also Norman v. Recreation Ctrs. of Sun City, Inc.*, 156 Ariz. 425, 428–29, 752 P.2d 514, 517–18 (App.1988)(holding that the discharge of an employee from a non-profit corporation allegedly resulting from a director's breach of fiduciary duties was not within the public policy exception to the at-will employment rule).

benevolent rationale. Best Western does not argue that the rationale was frivolous. With respect to the Portland, Maine and Romulus, Michigan matters, Best Western argues that Murcott put aside his concerns and carried out instructions from Huff and Brown to discourage the applications.

¶ 45 Best Western seems to argue that Murcott cannot wear the mantle of "whistle-blower" unless he refused to carry out his employer's directions. In effect, Best Western argues that Murcott insufficiently protested his employer's actions and should have been insubordinate. Best Western offers no legal authority for this argument. We decline to impose such a requirement on whistle-blowers because it would deter an employee's legitimate expressions of concern. The trial court's ruling on this issue is affirmed.

### b. Best Western Waived The Argument That Murcott Lacked A Good Faith Belief That The Protested Actions Were Illegal.

¶ 46 Best Western further argues that Murcott lacked a good-faith belief that its conduct violated federal and state antitrust laws. Murcott responds that Best Western has waived the issue by failing to raise it in any dispositive trial motion. Best Western responds that the issue appears in the parties' joint pre-trial statement, where it does appear, obliquely and only in passing.

¶ 47 We find that Best Western has waived the good faith argument. A joint pre-trial statement controls the subsequent course of litigation and may amend the pleadings. See Carlton v. Emhardt, 138 Ariz. 353, 355, 674 P.2d 907, 909 (App.1983) (a joint pre-trial memorandum that omitted a lack of personal jurisdiction defense removed the defense from the case). In a case paralleling Carlton, we held that the appellant waived an argument about whether the appellee had become a licensee because the record did not indicate that the appellee's status was squarely raised in the motion for directed verdict. See Van Dever v. Sears, Roebuck & Co., 129 Ariz. 150, 152, 629 P.2d 566, 568 (App.1981). In analyzing the waiver issue, we stated, "[Appellant's] reference to the issue in a trial memorandum is not enough to preserve the issue for appeal under the circumstances presented here." Id. Likewise, we conclude here that Best Western has waived the good faith issue, and therefore we cannot consider it on appeal. See id.; see also Westin Tucson Hotel Co. v. State Dep't of Revenue, 188 Ariz. 360, 364, 936 P.2d 183, 187 (App.1997)(questions not directly raised in the trial court cannot be considered on appeal).

### c. Murcott's Whistle–Blowing Activities Were Directed To Those Who Could Take Corrective Action.

¶ 48 Best Western also argues that Murcott's claim fails as a matter of law because (1) he failed to report the relevant activities to persons who could take corrective action, and (2) he failed to report these activities to external authorities.

¶ 49 Best Western notes that Murcott directed his complaints to the individual defendants and to the board of directors, none of whom could correct the problem. See Faust v. Ryder Commercial Leasing & Servs., 954 S.W.2d 383 (Mo.App.1997)(plaintiff did not "blow the whistle" by speaking only to the wrongdoer himself).

¶ 50 Murcott replies that he complained to the board itself about the Page applications, not merely to its individual members. He also directed his protests to Sundlof and raised concerns about potential antitrust law violations with Evans, who was then his supervisor, company President and Chief Executive Officer.

¶ 51 We find that Murcott's protests to Evans and Sundlof and to the board generally were legally sufficient. Evans was at least a higher authority whose executive status cannot be discounted. See Brenneke v. Department of Mo., Veterans of Foreign Wars, 984 S.W.2d 134 (Mo.App.1998) (a report of wrongdoing to supervisors is adequate to satisfy the whistle-blowing requirements). Further, his report to Evans at least allowed management the chance to address actual wrongdoing or clear up antitrust misunderstandings at the outset. A contrary conclusion would have prevented Murcott

from making his case to anyone in the company, thereby foreclosing any possibility of an internal resolution. We are unwilling to place Murcott or any other employee in such a position.[3]

¶ 52 Best Western also contends that a complaint to outside legal counsel fails to support a whistle-blowing claim and that discussions with Sundlof were unremarkable because he was Best Western's outside legal counsel. Because Sundlof was required to represent the company, the argument goes, he was not in a position to take corrective action.

¶ 53 The upshot of this argument is that employees cannot carry reports about possible antitrust violations to company counsel best equipped to deal with them. Such a policy would discourage employees from consulting legal counsel. We reject this argument for this reason.

¶ 54 Equally unavailing is Best Western's argument that Murcott's failure to report the company's activities to outside authorities impairs his claim. In *Wagner* the court approved a cause of action for an internal complaint by the police officer discharged for questioning the unlawful detention of an arrested person. *See* 150 Ariz. at 89, 722 P.2d at 257.[4] Like the trial court, we are persuaded that such claims deserve protection.

¶ 55 The rationale for this approach was best described in *Sullivan v. Massachusetts Mut. Life Ins. Co.,* 802 F.Supp. 716 (D.Conn. 1992), where the plaintiff alleged that he was discharged because he complained about insider-trading of securities. The defendants argued that the claim failed because the plaintiff never reported any alleged violations to outside authorities. In rejecting this argument, the court explained salutary reasons

for protecting internal whistle-blowing activity:

> This rule makes sense. A rule that would permit the employer to fire a whistleblower with impunity before the employee contacted the authorities would encourage employers promptly to discharge employees who bring complaints to their attention, and would give employees with complaints an incentive to bypass management and go directly to the authorities. This would deprive management of the opportunity to correct oversights straightaway, solve the problem by disciplining errant employees, or clear up a misunderstanding on the part of the whistleblower. The likely result of a contrary rule would be needless public investigations of matters best addressed internally in the first instance. Employers benefit from a system in which the employee reports suspected violations to the employer first. . . .

*Id.* at 725 (citing *Norris v. Lumbermen's Mut. Cas. Co.,* 881 F.2d 1144, 1153 (1st Cir.1989) (employer liable for discharge of employee because of his purely internal complaints of violations of Nuclear Regulatory Commission regulations)).

### e. Murcott Reported New Violations Of Company Rules.

¶ 56 Best Western further attacks the trial court's ruling by arguing that whistle-blowing claims do not extend to reports of known violations. Relying upon a Minnesota court of appeals case, it argues that the mere mention of a suspected violation already acknowledged by one's employer does not constitute a report under that state's whistleblower statute. *See Donahue v. Schwegman, Lundberg, Woessner & Kluth, P.A.,* 586 N.W.2d 811, 813–14 (Minn.Ct.App.1998). Based upon this analogy, Best Western ap-

---

**3.** We find instructive on this point certain aspects of federal employment discrimination law as prescribed in Title VII of the Civil Rights Act of 1964, as amended, 42 United States Code, section 2000(e) *et seq.* Exhaustion of administrative remedies is a prerequisite to any civil action claiming adverse employment conditions against a federal employer. *See Brown v. G.S.A.,* 425 U.S. 820, 835, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *White v. G.S.A.,* 652 F.2d 913, 916–17 (9th Cir.1981). The purpose of Title VII's ex-

haustion requirement is to encourage internal administrative conciliation and remedy of employment discrimination complaints. *See, e.g., Ong v. Cleland,* 642 F.2d 316, 318–19 (9th Cir. 1981).

**4.** *See also Ford v. Revlon,* 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987) (company liable for disregarding employee's purely internal complaints about sexual harassment by supervisor).

parently concludes that Murcott failed to whistle-blow and therefore his claim fails.

¶ 57 The Minnesota statutory approach leads to anomalous results. It would allow an employer who knowingly engages in illegal activities to terminate with impunity an employee for pointing out the illegality. This approach aside, we find that Murcott *did* point out Best Western's potential antitrust violations. His reports to the board concerning misconduct by specific members disclosed information about violations to persons not involved in the violations. Murcott reported potential antitrust concerns as existing members were attempting to create exclusive territories and vetoing new applications seemingly for that reason. Evidence exists in the record to support the argument that Murcott properly blew the whistle with specificity.

### f. Sufficient Evidence Supported Murcott's Argument That Whistle–Blowing Activity Was A Substantial Motivating Factor For His Discharge.

¶ 58 According to Best Western, Murcott also failed to prove that his whistle-blowing motivated his termination. This court previously addressed the causation question in the appeal from the trial court's grant of summary judgment to Best Western. We reversed the trial court's ruling and held that a jury should be entitled to hear the whistle-blowing evidence to determine whether it met the substantial motivating factor test. *See Murcott*, 1 CA–CV 97–0514, at 13–14. We are now charged with evaluating the denial of a motion for directed verdict on this issue. Based upon the evidence at trial, we find once again sufficient probative evidence to support the whistle-blowing claim and to justify the denial of the directed verdict on liability.

¶ 59 Three company directors confirmed that Murcott's whistle-blowing activities were a factor in his discharge. Walter testified that Murcott was targeted as a scapegoat by individual defendants and that his stance on antitrust compliance worked against him in the long run. Seaton testified similarly that Murcott was not viewed as a team player and that the key factor was his stand on antitrust

compliance. Vande Berg testified that Murcott was specifically criticized for his position on antitrust compliance at the very meeting which decided his termination.

¶ 60 The board also failed to follow its own firing policies and to investigate the job performance allegations against Murcott and further failed to ask Evans, his supervisor, to prepare a report. Evans, who had daily contact with Murcott, opposed his termination. These facts, combined with the testimony from Walter, Seaton, and Vande Berg, generate an inference that the alleged whistle-blowing activities were a substantial factor motivating the termination.

¶ 61 Best Western stresses that Murcott was not discharged until a full year after he began his protests and seven months after he complained about Best Western's handling of the Page matter. Murcott emphasizes that the Page matter was the subject of the parties' greatest contention. Murcott told Brown that he would not support the board if Wang brought legal action, and Best Western did receive a demand letter from Wang's attorney in January 1995. On July 3, 1995, Best Western and Wang signed a release of liability which meant that, because Murcott no longer could be a star witness for Wang in any litigation, Murcott could not damage Best Western's position. He was fired shortly thereafter but, given this chronology, he could not have been fired for testifying in support of Wang.

¶ 62 The timing evidence therefore provides no clear support for either side's position. Nevertheless, the combined effect of the other evidence adequately supports the jury's causation determination.

### 2. As A Matter of Law, Best Western Cannot Obtain Reversal Based Upon One Component Of Damages Awarded In A General Verdict.

¶ 63 Best Western alternatively argues that Murcott's evidence fails to justify emotional distress damages because the sole evidence of such damage was Murcott's statement that he "had not had a happy day" since leaving Best Western. It accordingly

asks this court to overturn both the economic and emotional distress awards.

¶ 64 We uphold a general verdict if evidence on any one count, issue or theory sustains the verdict. *See Reese v. Cradit,* 12 Ariz.App. 233, 238, 469 P.2d 467, 472 (1970); *see also Dunlap v. Jimmy GMC of Tucson, Inc.,* 136 Ariz. 338, 341–42, 666 P.2d 83, 86–87 (App.1983) (appellant could not challenge a general verdict because of ample evidence to sustain the award at least for the consumer fraud count). The trial court instructed the jury that, in calculating the damages award, it was to consider both "Plaintiff's lost earnings and the value of lost benefits to date and to be lost in the future" and the "[m]ental anguish and emotional distress suffered by plaintiff." The jury responded by returning a general verdict for $1.75 million. Murcott argues that expert evidence indicated that his economic losses alone exceeded $2 million; Best Western does not rebut the point. Because there indisputably was evidence to support the verdict as to economic damages alone, Best Western's argument fails and the verdict must stand. *See Dunlap,* 136 Ariz. at 341, 666 P.2d at 86.

¶ 65 Moreover, although Best Western argues that Murcott's lone statement about not having a "happy day" since his termination was insufficient to support emotional distress, it ignores the entirety of the evidence. Murcott's demeanor at trial coupled with his statement constituted sufficient evidence for the jury to consider.

¶ 66 Finally, if Best Western wished to preserve an attack on the sufficiency of emotional distress damages, it should have requested special interrogatories or special verdict forms for each damage component. Such forms would have shown amounts awarded for each damage component and allowed Best Western to attack individual components of the award. Best Western did not do so. In the absence of such special forms, we will not reverse an award well-supported by the evidence of economic damages alone.

### C. *Murcott's Cross–Appeal*

¶ 67 Murcott cross-appeals the trial court's directed verdict on his punitive damages claim. In order for a plaintiff to recover punitive damages, it is usually not enough to show that the defendant committed a tort; the plaintiff ordinarily must show "something more." *Rawlings v. Apodaca,* 151 Ariz. 149, 161, 726 P.2d 565, 577 (1986) (citation omitted). Murcott was required to show, by clear and convincing evidence, that Best Western acted with an "evil hand ... guided by an evil mind." *Thompson v. Better–Bilt Aluminum Prods. Co.,* 171 Ariz. 550, 556, 832 P.2d 203, 209 (1992)(quoting *Rawlings,* 151 Ariz. at 162, 726 P.2d at 578). The evidence must reflect that Best Western intended to injure Murcott or was deliberately indifferent to the rights of others, consciously disregarding substantial risk of significant harm. *See id.* (citing *Rawlings,* 151 Ariz. at 161, 726 P.2d at 577).

¶ 68 Courts consider "the nature of the defendant's conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, as well as the harm that has occurred[,] ... [t]he duration of the misconduct, the degree of defendant's awareness of the harm or risk of harm, and any concealment of it." *Id.* (quoting *Hawkins v. Allstate Ins. Co.,* 152 Ariz. 490, 497, 733 P.2d 1073, 1080). Punitive damages may rest on an aggregation of several pieces of evidence. *See id.* at 558, 832 P.2d at 211.

¶ 69 The Arizona Supreme Court applied this standard in *Thompson v. Better–Bilt Aluminum Products Co.,* in which it found a deliberate policy of discharging workers—including the plaintiff—who filed workers' compensation claims. 171 Ariz. at 559, 832 P.2d at 212. The company effectuated this practice by writing up false "voluntary" terminations and withholding notice of these terminations from employees, all indicating the employer's knowledge that its actions were wrong and harmful.

¶ 70 No evidence exists here that Best Western systematically discharged employees who complained about the company's alleged antitrust policies. Murcott nevertheless contends that cumulative evidence relat-

ing to his own termination justifies a reversal of the directed verdict because of:

1.  the questionable timing of Murcott's termination in light of the settlement of the antitrust dispute with Wang;
2.  "the differing, pretextual and unsupported reasons" proffered by each individual director for Murcott's discharge;
3.  the destruction or spoilation of evidence of the Board's termination meeting; and
4.  Best Western's failure to follow its own policies.

¶ 71 These instances do not supply clear and convincing evidence of an evil mind. The timing of these events neither supports nor disproves either side's position. Although the discharge occurred within weeks of the settlement with Wang, it also came almost a year after Murcott began his complaints.

¶ 72 Similarly, the absence of a record of the termination decision does not evince an evil mind. Although the board did record executive sessions, it was not a regular practice. Brown thought that he might have tape-recorded the July 24, 1995 session but never found the tape. Brown also thought that he might have taken notes on his lap-top computer but the notes were lost when the machine was replaced. No evidence shows a clearly improper motive behind these events. Because multiple witnesses attended the discharge meeting, including at least three directors who supported Murcott, any effort to conceal the reasons for his discharge would have been futile. Moreover, the trial court found no spoilation of evidence and dismissed Murcott's arguments as irrelevant to the punitive damages issue.

¶ 73 Murcott also invokes Best Western's failure to follow its own procedures with respect to the discharge decision but misplaces reliance on this factor. Such evidence supports Murcott's termination for bad cause but does not support punitive damages.

¶ 74 Finally, Murcott proffers evidence that the individual defendants offered differing and pretextual reasons for his discharge. He points out that three defendants testified to additional reasons for his discharge at trial yet failed to mention these reasons during their depositions. Huff initially said that Murcott was discharged because the board lost confidence in his administrative abilities but later told the jury that the discharge rested on morale problems and reorganization plans. Brown testified that Murcott was not the right person for the position and that Jacobs was involved in the discussion, yet made no mention of Jacobs in his prior deposition. Unruh's testimony followed similar lines.

¶ 75 Murcott also points out that some directors contradicted testimony offered by other directors concerning the reasons for his termination. For example, four witnesses impeached Huff's testimony at trial. In addition, Mathis claimed that he wanted Murcott discharged because he failed to pay an employee a bonus pursuant to Best Western's incentive compensation plan. Murcott had determined, however, that the employee was not eligible to receive that bonus during that fiscal year. Unruh and Huff testified that Mathis' reason did not justify Murcott's termination.

¶ 76 As Murcott points out, the reasons given for his discharge varied from witness to witness and expanded to include new reasons by the time of trial. But this evidence fails to suggest any conspiracy or "evil mind" or to mislead Murcott about the basis for his discharge. Moreover, in contrast to the subterfuge in *Thompson,* these alleged pretextual representations all arose *after* Murcott's employment ended. No effort by Best Western appears to mislead Murcott *during* his employment. We affirm the trial court's grant of the directed verdict on punitive damages.

## III.  CONCLUSION

¶ 77 Sufficient probative evidence exists to sustain the denial of Best Western's JMOL on liability for wrongful discharge in violation of public policy. Murcott failed to produce sufficient evidence to justify the reversal of the JMOL on punitive damages. Accordingly, we affirm the trial court's decision in all respects.

CONCURRING: REBECCA WHITE BERCH, Presiding Judge, and ANN A. SCOTT TIMMER, Judge.