SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| RYAN COLEMAN and LAETITIA COLEMAN, | ) Arizona Supreme Court<br>) No. CV-11-0351-PR<br>) |
| Appellants, | ) Court of Appeals<br>) Division One |
| v. | ) No. 1 CA-CV 10-0808<br>) |
| CITY OF MESA, a municipal corporation; MESA CITY COUNCIL, a body politic; SCOTT SMITH, Mayor; LINDA CROCKER, City Clerk; KYLE JONES, Vice Mayor and City Council Member; ALEX FINTER, DINA HIGGINS, DENNIS KAVANAUGH, DAVE RICHINS, SCOTT SOMERS, City Council Members, | ) Maricopa County<br>) Superior Court<br>) No. CV2010-092351<br>)<br>)<br>)<br>)<br>) **O P I N I O N**<br>)<br>)<br>) |
| Appellees. | )<br>) |

Appeal from the Superior Court in Maricopa County
The Honorable Larry Grant, Judge

**REVERSED AND REMANDED**
_____

Opinion of the Court of Appeals, Division One
228 Ariz. 240, 265 P.3d 422 (2011)

**VACATED**
_____

SCHARF-NORTON CENTER FOR CONSTITUTIONAL LITIGATION          Phoenix
AT THE GOLDWATER INSTITUTE
       By   Clint Bolick
            Carrie Ann Sitren

And

KIELSKY, RIKE & ELGART, P.L.L.C.                              Scottsdale
       By   Michael Kielsky
Attorneys for Ryan Coleman and Laetitia Coleman

MARISCAL, WEEKS, MCINTYRE & FRIEDLANDER, P.A.          Phoenix
     By   Scott A. Holcomb
          Fredda J. Bisman
          David N. Ferrucci
Attorneys for City of Mesa, Mesa City Council, Scott Smith,
Linda Crocker, Kyle Jones, Alex Finter, Dina Higgins, Dennis
Kavanaugh, Dave Richins, and Scott Somers

LEAGUE OF ARIZONA CITIES AND TOWNS                     Phoenix
     By   Joni Hoffman
Attorney for Amicus Curiae League of Arizona Cities and Towns

_____

**B A L E S**, Vice Chief Justice

¶1      This case involves the intersection of municipal zoning regulations and the right of tattoo artists to ply their trade.  After the City of Mesa denied Ryan and Laetitia Coleman a permit to operate a tattoo parlor, the Colemans filed this action alleging violations of their rights to free speech, due process, and equal protection under the federal and Arizona Constitutions.  The superior court dismissed the complaint under Arizona Rule of Civil Procedure 12(b)(6) for failing to state a claim upon which relief can be granted.

¶2      Recognizing that tattooing involves constitutionally protected speech, we hold that the superior court erred by dismissing the complaint as a matter of law.  We vacate the opinion of the court of appeals, reverse the judgment of the superior court, and remand to that court for further proceedings consistent with this opinion.

¶3      Mesa City Code § 11-6-3(B) requires tattoo parlors and other specified businesses (including pawn shops, body piercing salons, and non-chartered financial institutions) to obtain a Council Use Permit (CUP) in order to operate in the city.[1]  The Colemans applied in July 2008 for a CUP to open a parlor in a Mesa strip mall.  Under the code, Mesa's Planning and Zoning Board reviews each CUP application and makes a recommendation to the City Council.  In February 2009, city zoning staff recommended that the City issue the Colemans a permit, subject to certain conditions, which they accepted.  Nonetheless, after a public hearing, the Board voted 3-2 to recommend that the Council deny the CUP, citing concerns that the proposed use was not appropriate for the location or in the best interest of the neighborhood.  The Council held a public meeting in March 2009 at which it received comments from several speakers supporting and opposing the tattoo parlor.  Ultimately, the Council voted 6-1 to deny the permit.

¶4      The Colemans sued the City of Mesa and various city officials (collectively "Mesa").  Their complaint alleges that Mesa's denial of the CUP violated their rights to free speech,

[1]  This opinion cites the version of Mesa's zoning ordinance in effect in 2008-09.  Effective September 3, 2011, Mesa replaced its previous ordinance with a new one.  The parties have not suggested that the new ordinance affects the resolution of any issues pending before this Court.

due process, and equal protection under the federal and Arizona Constitutions, and it seeks declaratory and mandamus relief and damages under 42 U.S.C. § 1983. Mesa moved to dismiss the lawsuit under Rule 12(b)(6) for failing to state a claim upon which relief can be granted. The superior court granted the motion, observing that the Council's decision "was a reasonable and rational regulation of land use."

¶5 The court of appeals reversed. *Coleman v. City of Mesa*, 228 Ariz. 240, 244 ¶ 1, 265 P.3d 422, 426 (App. 2011). Citing *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010), the court held that "obtaining a tattoo, applying a tattoo, and engaging in the business of tattooing" are "pure speech entitled to the highest level of protection" by the First Amendment and Article 2, Section 6 of Arizona's Constitution, 228 Ariz. at 244 ¶ 1, 265 P.3d at 426. The court of appeals further concluded that the Colemans had "sufficiently alleged claims for violations of their free speech, equal protection, and due process rights," and the trial court had erred by dismissing the complaint without allowing the parties to develop a factual record. *Id.*

¶6 We granted Mesa's petition for review because this case involves issues of first impression and statewide importance regarding the free speech rights of tattoo artists and the authority of municipal governments to regulate the

4

location of tattoo parlors.

II.

¶7    Dismissal of a complaint under Rule 12(b)(6) is reviewed de novo.  We clarify the standard of appellate review here because our past statements have been inconsistent.  In *Dressler v. Morrison*, 212 Ariz. 279, 281 ¶ 11, 130 P.3d 978, 980 (2006), the Court stated that an order granting a motion to dismiss is reviewed for abuse of discretion, citing *Franzi v. Superior Court*, 139 Ariz. 556, 561, 679 P.2d 1043, 1048 (1984).  *Franzi*, however, involved a criminal proceeding rather than a motion to dismiss a civil pleading under Rule 12(b)(6).  139 Ariz. at 558, 579 P.2d at 1045.  *Dressler*, moreover, recognized that issues of law are reviewed de novo.  212 Ariz. at 281 ¶ 11, 130 P.3d at 980.

¶8    Dismissal is appropriate under Rule 12(b)(6) only if "as a matter of law [] plaintiffs would not be entitled to relief under any interpretation of the facts susceptible of proof."  *Fid. Sec. Life Ins. Co. v. State Dep't of Ins.*, 191 Ariz. 222, 224 ¶ 4, 954 P.2d 580, 582 (1998).  Because questions of law are reviewed de novo, *e.g.*, *Wilmot v. Wilmot*, 203 Ariz. 565, 569 ¶ 10, 58 P.3d 507, 511 (2002), the grant of a dismissal under Rule 12(b)(6) is reviewed de novo.

¶9    "Arizona follows a notice pleading standard."  *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419 ¶ 6, 189 P.3d 344,

5

346 (2008).  In determining if a complaint states a claim on which relief can be granted, courts must assume the truth of all well-pleaded factual allegations and indulge all reasonable inferences from those facts, but mere conclusory statements are insufficient.  *Id.* ¶ 7.  "[C]ourts look only to the pleading itself" when adjudicating a Rule 12(b)(6) motion.  *Id*.  If "matters outside the pleading" are considered, the motion must be treated as one for summary judgment.  Ariz. R. Civ. P. 12(b)(6).  A complaint's exhibits, or public records regarding matters referenced in a complaint, are not "outside the pleading," and courts may consider such documents without converting a Rule 12(b)(6) motion into a summary judgment motion.  *See Strategic Dev. & Constr., Inc. v. 7th & Roosevelt Partners, LLC*, 224 Ariz. 60, 63 ¶ 10, 64 ¶ 13, 226 P.3d 1046, 1049-50 (App. 2010).

### III.

### A.

¶**10**     "Tattooing," as used in this opinion, refers to:

> mark[ing]the skin with any indelible design, letter, scroll, figure, symbol or any other mark that is placed by the aid of needles or other instruments upon or under the skin with any substance that will leave color under the skin and that cannot be removed, repaired or reconstructed without a surgical procedure.

A.R.S. § 13-3721(E)(2).  Although tattooing has an ancient history and has been practiced in many different cultures, the

6

modern process generally involves electronically powered tattoo machines that move a solid needle up and down to puncture the skin between 50 and 3,000 times per minute, depositing insoluble ink into the skin with each puncture. *Anderson*, 621 F.3d at 1055. Because the process involves puncturing the skin repeatedly, tattooing carries risks of infection and transmission of disease if done with unsterile equipment or in unsanitary conditions. *Id.* at 1056. When properly performed, tattooing generally is a safe procedure. *Id.*

¶11 Arizona does not extensively regulate the practice of tattooing. Persons who provide tattoos, referred to as tattoo artists, are not certified, licensed, or registered by the state. State law does, however, bar the use of needles that have not been properly sterilized, the reuse of needles, and the improper disposal of used needles. A.R.S. §§ 13-3721(A)(2), 44-1342. It is also unlawful to tattoo a minor unless the child's parent or legal guardian is present. *Id.* § 13-3721(A)(1).

¶12 The City of Mesa also imposes few regulations on tattooing. It does not certify, license, or register tattoo artists; nor does it generally regulate the manner in which tattoo parlors operate. Mesa provides that tattoo parlors cannot be within 1,200 feet of a school, another tattoo parlor, or a body piercing salon. Mesa City Code § 11-6-3(B)(2). (This location restriction is not at issue here.) Mesa additionally

7

requires tattoo parlors to obtain a CUP. *Id.*

¶13    Under Mesa's zoning code, a CUP is a "discretionary authorization" that the City Council may issue if it finds, "through a public hearing that the proposed activity is in conformance with the intent of this Code, the General Plan, and/or other specified plans or Council policies and will be compatible with, and not detrimental to, adjacent properties or the neighborhood in general." *Id.* § 11-1-6. A CUP may issue only after the City Council finds that the use will "be compatible with surrounding uses." *Id.* § 11-6-3(B)(4). The parties agree that many tattoo studios operate in Mesa with city approval.

### B.

¶14    We first consider whether the Colemans have stated a claim for relief based on the First Amendment or Article 2, Section 6 of Arizona's Constitution. The First Amendment proscribes laws "abridging the freedom of speech," and Article 2, Section 6 of our state constitution declares that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." These provisions, the Colemans argue, protect the right of tattoo artists to engage in creative expression by operating tattoo parlors.

¶15    Mesa argues that we need not determine if tattooing is

8

constitutionally protected expression because, even if it is, generally applicable zoning laws may apply to otherwise protected activities without presenting free speech issues. *See Leathers v. Medlock*, 499 U.S. 439, 447-49 (1991) (finding no "First Amendment difficulties" in applying general tax to media); *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705 (1986) (holding that First Amendment did not preclude closing of adult bookstore, pursuant to generally applicable nuisance statute, when solicitation of prostitution was occurring on premises). Mesa further notes that its zoning code requires CUPs for a wide range of property uses including schools, rescue missions, pool halls, and apartments. *See* Mesa City Code § 11-6-3.

**¶16**     We are not persuaded by Mesa's characterization of the denial of a CUP to the Colemans as merely the application of a general law that incidentally affects speech-related activities. Mesa's zoning ordinance effectively prohibits certain uses, including tattoo parlors, unless the City Council issues a discretionary CUP.  The City is not attempting to impose a generally applicable law, such as the tax in *Leathers* or the nuisance prohibition in *Arcara*, to the on-going operations of businesses engaged in protected speech.   Instead, the City claims that the Council may exercise its unfettered discretion (which it also argues is effectively non-reviewable) to deny permission for businesses engaged in protected speech to operate

9

at all because it has similar discretion to deny permission for other, non-protected uses.

¶17     The fact that a permit scheme may also apply to non-protected activities does not insulate it from constitutional challenge when applied to protected speech. *See, e.g.*, *Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002). *Thomas* is illustrative, as it involved a challenge to a city ordinance requiring permits for events involving fifty or more people in public parks, whether soccer games, picnics, or political rallies. Recognizing that the ordinance "is not even directed to communicative activity as such, but rather to *all* activity conducted in a public park," *id.* at 322, the Supreme Court nonetheless considered whether it satisfied the constitutional requirements for reasonable time, place, and manner regulations, including the requirement that there be adequate standards to guide the discretion of the official issuing the permit. *See id.* at 323; *see also Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130–31 (1992) (concluding that permit and fee requirements applicable to "any activity on public property – from parades, to street corner speeches, to bike races" violated the First Amendment by vesting unbridled discretion in permitting officials).

¶18     To determine if the Colemans have stated a claim for a violation of their free speech rights, we must determine whether

10

tattooing is constitutionally protected expression. Courts in other jurisdictions are divided on this issue, which in turn reflects differing views on whether tattooing should be characterized as purely expressive activity ("pure speech") or instead as conduct with an expressive component. We use the terms "purely expressive activity" and "pure speech" to refer not only to written or spoken words, but also to other media (such as painting, music, and film) that predominantly serve to express thoughts, emotions, or ideas. *See Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 568-70 (1995) (holding that "expressive parades" are protected speech for purposes of First Amendment); *Coleman*, 228 Ariz. at 248-49 ¶ 14, 265 P.3d at 430-31 (similarly defining "pure speech").

**¶19**　　"If tattooing is purely expressive activity, then it is entitled to full First Amendment protection" and can be regulated only through reasonable time, place, and manner restrictions. *Anderson*, 621 F.3d at 1059 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). If, however, tattooing is instead characterized as conduct with an expressive component, it will be protected under the First Amendment only if it is "sufficiently imbued with elements of communication," that is, there is "[a]n intent to convey a particularized message" and "the likelihood [is] great that the message [will]

11

be understood" by viewers.  *Spence v. Washington*, 418 U.S. 405, 409-11 (1974).  Restrictions on protected expressive conduct are evaluated under the test announced in *United States v. O'Brien*, 391 U.S. 367, 376-77 (1968) (analyzing prosecution for symbolic burning of draft card to protest the draft).[2]  Finally, if the conduct is not "sufficiently imbued with elements of communication," then the regulation need only be rationally related to a legitimate governmental interest.  *Anderson*, 621 F.3d at 1059 (internal quotation marks omitted) (citing *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 68 (1981)).

¶20    One end of the spectrum is illustrated by the Ninth Circuit's opinion in *Anderson*, which held that "tattooing is purely expressive activity fully protected by the First Amendment."  621 F.3d at 1055.  The court of appeals in this case agreed with *Anderson* and further ruled that "Mesa's ordinance and permit process are subject to intermediate scrutiny" to determine if they constitute a reasonable time, place, and manner regulation.  *Coleman*, 228 Ariz. at 250 ¶ 18, 265 P.3d at 432.

---

[2]  Under the *O'Brien* test, a regulation of protected expressive conduct is constitutional if (1) it is within the government's constitutional power; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. 391 U.S. at 377.

¶21     Several other courts, however, have concluded that tattooing is not protected by the First Amendment because it is not itself expressive conduct. *See, e.g*, *Hold Fast Tattoo, LLC v. City of North Chicago*, 580 F. Supp. 2d 656, 660 (N.D. Ill. 2008) (finding that "act of tattooing is one step removed from actual expressive conduct"); *Yurkew v. Sinclair*, 495 F. Supp. 1248, 1253-55 (D. Minn. 1980) (finding process of tattooing is not protected speech); *State ex rel Medical Licensing Bd. v. Brady*, 492 N.E.2d 34, 39 (Ind. Ct. App. 1986) (same); *State v. White*, 560 S.E.2d 420, 422 (S.C. 2002) (same).

¶22     A third approach, refusing to treat tattooing categorically as either protected or unprotected expression, has been suggested in scholarly commentary. *See* Ryan J. Walsh, Comment, *Painting on a Canvass of Skin: Tattooing and the First Amendment*, 78 U. Chi. L. Rev. 1063 (2011). Relying on *Mastrovincenzo v. City of New York*, 435 F.3d 78 (2d Cir. 2006), this approach would extend First Amendment protections to a particular tattoo artist's work if it has a predominantly expressive purpose. Courts would therefore make a case-by-case inquiry to determine if tattooing is protected by the First Amendment. Walsh, *supra*, at 1097-1100.

¶23     We conclude that the approach adopted in *Anderson* is most consistent with First Amendment case law and the free speech protections under Arizona's Constitution. *Anderson*

13

starts with the proposition that a tattoo itself is pure speech. 621 F.3d at 1060. This seems incontrovertible. "[T]he Constitution looks beyond written or spoken words as mediums of expression," *Hurley*, 515 U.S. at 569, and the Supreme Court has recognized that the First Amendment protects a range of expressive activity including parades, music, paintings, and topless dancing. *See id.; Anderson*, 621 F.3d at 1060.

¶24 Tattoos, as the Ninth Circuit noted in *Anderson*, are generally composed of words, realistic or abstract symbols, or some combination of these items. 621 F.3d at 1060. They can express a broad range of messages, and they may be purely decorative or serve religious, political, or social purposes:

> The principal difference between a tattoo and, for example, a pen-and-ink drawing, is that a tattoo is engrafted onto a person's skin rather than drawn on paper. This distinction has no significance in terms of the constitutional protection afforded the tattoo; a form of speech does not lose First Amendment protection based on the kind of surface it is applied to.

*Id; see also White*, 560 S.E.2d at 425 (Waller, J., dissenting) (observing that "whether or not something is 'speech' protected by the First Amendment cannot focus upon the medium chosen for its expression").

¶25 A tattoo involves expressive elements beyond those present in "a pen-and-ink" drawing, inasmuch as a tattoo reflects not only the work of the tattoo artist but also the

14

self-expression of the person displaying the tattoo's relatively permanent image. Of course, there is no First Amendment right to tattoo another person against his or her will, *see Anderson*, 621 F.3d at 1068 (Noonan, J., concurring) (noting that "[a] tattoo punitively affixed is unprotected"), and indeed the First Amendment (and other constitutional provisions) would prevent the government from requiring a person to be tattooed. *Cf. Wooley v. Maynard*, 430 U.S. 705 (1977) (holding that First Amendment barred state from requiring citizens to display "Live Free or Die" motto on vehicle license plates).

¶26     We also agree with *Anderson*'s conclusion that the process of tattooing is expressive activity. *See* 621 F.3d at 1061-62.[3] Supreme Court case law has not distinguished "between the process of creating a form of *pure* speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded." *Id.* at 1061. For example, the art of writing is no less protected than the book it produces; nor is painting less an act of free speech than the painting that results. *Id.* at 1061-62.

---

[3]   Mesa attempts to distinguish *Anderson* by noting that it involved a city's total ban on tattooing, which the Ninth Circuit concluded was not a reasonable time, place, and manner regulation. The fact that *Anderson* considered a total ban, however, does not detract from the merits of its analysis of whether tattooing is protected speech.

15

¶27     This observation explains why we are not persuaded by decisions such as *Hold Fast Tattoo* that rely on *Spence* to conclude that tattooing is not protected by the First Amendment. *See, e.g.*, *Hold Fast Tattoo*, 580 F. Supp. 2d at 659-60; *Yurkew*, 495 F. Supp. at 1253.  The *Spence* test, which focuses on whether conduct is "sufficiently imbued" with expressive content to warrant protection, applies to conduct that is not itself generally expressive.  *Anderson*, 621 F.3d at 1061; *see Hurley*, 515 U.S. at 569 (declining to apply *Spence* test to expressive parades and noting it does not apply to paintings and music).

¶28     We also decline to apply *Mastrovincenzo*'s case-by-case approach to analyze the regulation of tattooing.  In *Mastrovincenzo*, the Second Circuit considered whether the First Amendment protected the sale of clothing painted with graffiti, and ultimately concluded that the sale was protected because "the disseminators of that clothing [were] genuinely and primarily engaged in artistic self-expression" rather than "a chiefly commercial exercise."  435 F.3d at 91.  *Mastrovincenzo*, however, adopted this approach to determine if certain products, such as t-shirts and caps, that are not generically expressive should nonetheless be protected by the First Amendment because the particular items "serve predominantly expressive purposes." *Id.* at 92.

¶29     *Mastrovincenzo* acknowledged that its case-by-case

16

approach does not apply to "paintings, photographs, prints and sculptures [that] always communicate some idea or concept to those who view it, and as such are entitled to full First Amendment protection." *Id.* (internal quotation omitted). Tattoos, in our view, are more like paintings than t-shirts in terms of their general expressive content. Moreover, a case-by-case inquiry would be difficult to administer and insufficiently protective of free speech rights: whether a particular artist could engage in tattooing might turn in the first instance on a licensing official's assessment whether the proposed work is "predominantly expressive" and ultimately on whether courts agreed with that assessment.[4]

¶30 Our conclusion that the process of tattooing is protected speech is also not affected by the fact that tattoo artists may use standard designs or patterns. In *Hurley*, the Court rejected arguments that a parade was not the protected expression of its organizers because it incorporated speech originally created by others. The Court noted that "First Amendment protection [does not] require a speaker to generate,

---

[4] *Mastrovincenzo* outlined a three-part inquiry to determine if a product is predominantly expressive: (1) the court should "consider whether that item also has a common non-expressive purpose or utility," 438 F.3d at 95; (2) if the court finds that an item has both expressive and non-expressive purposes, it must determine which purpose dominates; and (3) if an item is found to be predominantly expressive, the court must "take into account other factors that shed light on how and why an object is being sold or disseminated." *Id.* at 96.

17

as an original matter, each item featured in the communication. Cable operators, for example, are engaged in protected speech activities even when they only select programming originally produced by others." 515 U.S. at 570 (citing *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 636 (1994)). The fact that a tattoo artist may use a standard design or message, such as iconic images of the Virgen de Guadalupe or the words "Don't tread on me" beside a coiled rattlesnake, does not make the resulting tattoo any less expressive.

¶31 Determining that tattooing is protected speech also implies that the business of tattooing is constitutionally protected. *See Anderson*, 621 F.3d at 1062-63. "[T]he degree of First Amendment protection is not diminished merely because the [protected expression] is sold rather than given away." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988) (noting that "a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak"). This does not mean, of course, that the business of tattooing is shielded from governmental regulation. As discussed above, generally applicable laws, such as taxes, health regulations, or nuisance ordinances, may apply to tattooing businesses. Moreover, tattooing may be subject to reasonable time, place,

and manner regulations.  *See Ward*, 491 U.S. at 791; *Anderson*, 621 F.3d at 1059, 1064.

¶32     Having concluded that tattooing is protected speech, we next consider whether the Colemans' complaint sufficiently states a claim for relief based on alleged violations of the First Amendment or Article 2, Section 6 of Arizona's Constitution.  The Mesa ordinance, which requires a CUP for all tattoo parlors, is facially content-neutral and the Colemans do not contend that they were denied a permit based on the content of their contemplated speech.  The Colemans instead allege that the CUP process is not a reasonable time, place, and manner regulation of their protected expression.

¶33     For a permit system to qualify as a reasonable time, place, and manner regulation, the scheme "must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication."  *Thomas*, 534 U.S. at 323 n.3 (internal quotation omitted); *see also Forsyth Cnty.*, 505 U.S. at 130.  It also must "contain adequate standards to guide the official's decision and render it subject to effective judicial review."  *Thomas*, 534 U.S. at 323; *Forsyth Cnty.*, 505 U.S. at 130 (noting that "[a] government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation") (internal quotation

19

omitted).

¶34    The Colemans have alleged sufficient facts to state a claim on which relief can be granted for violations of the freedom of speech.  They allege that the City's "planning and zoning code approval criteria, facially and as applied by the City Council," do not sufficiently guide or limit the City Council's discretion in rendering decisions.  (In fact, before this Court, counsel for Mesa argued that the City Council's determinations on CUPs are discretionary and effectively non-reviewable.)

¶35    The Colemans further allege that they have agreed to comply with all the conditions that city zoning staff identified in recommending they be issued a permit; that the Council has issued permits to other tattoo parlors; and that they will comply with all applicable laws and reasonable regulations on the time, place, and manner of conducting their business.  They also allege that they have been discriminatorily denied a permit to operate their business, suppressing their free expression and that of their prospective customers.

¶36    If we accept these factual allegations as true, as we must for purposes of assessing a motion to dismiss on the pleadings, then the Colemans have stated a claim under the First Amendment because the "pleading itself" does not indicate that Mesa's denial of the CUP was a reasonable time, place, and

20

manner regulation of their speech.[5] *Cullen*, 218 Ariz. at 419 ¶ 7, 189 P.3d at 346. Although dismissal of the complaint under Rule 12(b)(6) was inappropriate, we express no opinion whether Mesa's ordinance, the CUP process, or the refusal to allow the Colemans to operate their tattoo business at a particular location were in fact reasonable restrictions or violated their free speech rights.

## C.

¶37 The Colemans also allege in their complaint that Mesa's denial of a CUP to operate a tattoo parlor violated their rights to equal protection and due process under the federal and Arizona Constitutions.

¶38 The Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . . nor deny to any person within its jurisdiction the equal protection of the laws." Article 2, Section 13 of Arizona's Constitution provides "[n]o law shall be enacted granting to any citizen

---

[5] Our conclusion that the Colemans have stated a claim under the First Amendment sufficient to withstand a Rule 12(b)(6) motion necessarily implies that they have also stated claims under Article 2, Section 6 of Arizona's Constitution, which is in some respects more protective of free speech rights than the First Amendment. *See, e.g.*, *State v. Stummer*, 219 Ariz. 137, 194 P.3d 1043 (2008) (identifying standard for evaluating content-based secondary effects regulations). Given the preliminary stage of this litigation, we have no occasion to address whether Article 2, Section 6 might afford greater protection to the activity of tattooing than applies under the First Amendment.

. . . privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." Both the Fourteenth Amendment and Article 2, Section 4 of Arizona's Constitution provide that no person may be deprived of life, liberty, or property "without due process of law."

¶39    Although the Colemans also assert in their complaint that they have been denied "privileges and immunities of citizenship" in violation of the Fourteenth Amendment, they have not alleged the deprivation of any rights protected under the Supreme Court's "narrow reading" of the Privileges or Immunities Clause. *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3029-30 (2010). Moreover, this Court has construed Article 2, Section 13 of Arizona's Constitution as applying the same standard as applies to equal protection claims under the federal constitution, *see Big D Constr. Corp. v. Court of Appeals*, 163 Ariz. 560, 565-66, 789 P.2d 1061, 1066-67 (1990); *Ariz. Downs v. Ariz. Horsemen's Found.*, 130 Ariz. 550, 555, 637 P.2d 1053, 1058 (1981), and the Colemans have not argued that another standard should apply. Thus, whether the Colemans have stated claims for relief in addition to their free speech claims reduces to whether they have stated sufficient claims under the federal Equal Protection Clause or the federal or state Due Process Clauses.

¶40    The court of appeals held that because tattooing is

22

protected speech, and speech is a fundamental right, courts should apply "strict scrutiny" in assessing whether the City's denial of a CUP to the Colemans violated either equal protection or due process. *Coleman*, 228 Ariz. at 253-54 ¶¶ 26-27, 29, 265 P.3d at 435-36. With respect to the First Amendment claims themselves, however, the court of appeals correctly recognized that intermediate scrutiny would apply in evaluating whether Mesa had imposed a permissible time, place, or manner restriction on the Colemans' operation of a tattoo parlor. *Id.* at 250 ¶ 18, 265 P.3d at 432.

¶41 The court of appeals erred by stating that more stringent scrutiny applies with respect to due process and equal protection claims involving the First Amendment than applies to the First Amendment claim itself. At oral argument, counsel for the Colemans acknowledged that, with respect to the free speech claims, the same level of scrutiny would apply whether they are grounded in the First Amendment or the Equal Protection and Due Process Clauses.

¶42 As the Third Circuit has observed:

If every time, place, and manner regulation were subject to strict scrutiny under the Equal Protection Clause simply because it burdened constitutionally protected speech, *Ward's* intermediate-scrutiny test would be rendered obsolete. Instead, it is only content-based time, place, and manner regulations that call for strict scrutiny-whether viewed through the lens of First Amendment or Equal Protection doctrine.

23

*Brown v. City of Pittsburgh*, 586 F.3d 263, 283 n.22 (3d Cir. 2009); *see also Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 394 (3d Cir. 2010) (noting that "where the state shows a satisfactory rationale for a content-neutral time, place, and manner regulation, that regulation necessarily survives scrutiny under the Equal Protection Clause") (internal quotation omitted); *Jones Intercable of San Diego, Inc. v. City of Chula Vista*, 80 F.3d 320, 327 (9th Cir. 1996) (recognizing that content-neutral restrictions are reviewed under intermediate scrutiny for either First Amendment or equal protection purposes). These remarks apply equally to claims that a content-neutral regulation violates due process because of its impact on protected speech. *See Albright v. Oliver,* 510 U.S. 266, 273 (1994) (noting that "[w]here a particular Amendment provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims") (internal quotations omitted).

¶43    That the Colemans' free speech claims do not trigger "strict scrutiny" does not mean, however, that the Colemans have failed to state claims for violations of due process or equal protection. For reasons explained in the preceding section, the Colemans have alleged that the ordinance and permit denial do

24

not satisfy intermediate scrutiny. Moreover, independent of any free speech issues, the Equal Protection and Due Process Clauses protect against government action that is arbitary, irrational, or not reasonably related to furthering a legitimate state purpose. *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446-50 (1985) (rejecting special use permit requirement as lacking a rational basis and thus violating equal protection); *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 484 (9th Cir. 2008) (explaining that substantive due process challenge to land use regulation requires allegation that it does not advance any legitimate government purpose); *Big D Constr. Corp.*, 163 Ariz. at 565-66, 789 P.2d at 1066-67 (applying rational basis standard to equal protection claim under Arizona Constitution); *Valley Nat. Bank of Phx. v. Glover*, 62 Ariz. 538, 553, 159 P.2d 292, 298-99 (1945) (discussing due process under Arizona Constitution).

¶**44**     The Colemans allege that, although other tattoo parlors have been allowed to operate in Mesa, the Council denied the Colemans a permit based on "perceptions, stereotypes and prejudice" rather than facts demonstrating that their business would harm the community. Thus, the Colemans have alleged that Mesa acted arbitrarily in denying them a permit and that the action did not further any legitimate government purpose.

¶**45**     Mesa responds that the Colemans cannot complain about

25

the denial of the permit because the City merely rejected their request to operate a tattoo parlor at a particular location. Mesa further contends that its Council acted reasonably in concluding that a tattoo parlor was not appropriate for this location and did not serve the best interests of the neighborhood. We acknowledge that municipalities have legitimate interests in controlling the location of businesses through zoning ordinances. *See Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 62 (1976) (permitting the city to "control the location of . . . commercial establishments, either by confining them to certain specified commercial zones or by requiring that they be dispersed throughout the city").

¶46 In adjudicating a Rule 12(b)(6) motion to dismiss, however, a court does not resolve factual disputes between the parties on an undeveloped record. Instead, the issue is whether the pleading states a sufficient claim to warrant allowing the Colemans to attempt to prove their case. The complaint sufficiently sets forth claims for relief for alleged violations of the Colemans' rights to free speech, equal protection, and due process. Whether they can prove those claims will depend on the course of proceedings in the trial court.

**IV.**

¶47 The superior court erred in dismissing the Colemans' complaint pursuant to Rule 12(b)(6) for failing to state a claim

26

upon which relief can be granted.  We vacate the opinion of the court of appeals, reverse the judgment of the superior court, and remand to that court for further proceedings consistent with this opinion.  We deny the Colemans' request for attorney fees without prejudice to their renewing this request with the superior court should they ultimately prevail.


                                       _____
                                       Scott Bales, Vice Chief Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
A. John Pelander, Justice


_____
Robert M. Brutinel, Justice