NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

LEMAD CORPORATION, an Arizona corporation, *Plaintiff/Appellant*,

*v.*

MIRAVISTA HOLDINGS, L.L.C., an Arizona limited liability company;
RIO AND RIVER HOLDINGS, L.L.C., an Arizona limited liability
company; BRADLEY D. WILDE, in his sole and separate capacity; and
BRADLEY D. WILDE and JANET P. WILDE, husband and wife,
*Defendants/Appellees*.

No. 1 CA-CV 12-0619

FILED 09-18-2014

---

Appeal from the Superior Court in Maricopa County
No. CV2011-008322
The Honorable J. Richard Gama, Judge

**AFFIRMED**

---

COUNSEL

Wilenchik & Bartness, PC, Phoenix
By Dennis I. Wilenchik and Tyler Q. Swensen
*Counsel for Plaintiff/Appellant*

Dickinson Wright, PLLC, Phoenix
By James T. Braselton, Michael S. Rubin and Laura R. Curry
*Counsel for Defendants/Appellees*

---

**MEMORANDUM DECISION**

---

Presiding Judge Kent E. Cattani delivered the decision of the Court, in which Judge Margaret H. Downie and Judge Michael J. Brown joined.

---

**C A T T A N I**, Judge:

¶1        LeMad Corporation ("LeMad") appeals the superior court's judgment dismissing with prejudice its claims against Appellees Miravista Holdings, L.L.C., ("Miravista"), Rio and River Holdings, L.L.C. ("Rio Holdings"), Bradley D. Wilde, and Janet P. Wilde.  LeMad argues that the court erred by dismissing its complaint for failure to state a claim and by denying its motion for new trial or to alter or amend the judgment.  For reasons that follow, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2        LeMad owned approximately 21.5 acres, consisting of three parcels in Tempe, Arizona (the "Property").  LeMad used the Property for industrial purposes and also leased it for storage and concrete recycling.  The Property was in a redevelopment area that subsequently became part of the City of Tempe's Rio Salado Redevelopment District.  In 2002, the City selected Miravista as the primary master planner and developer for the Redevelopment District, which would ultimately include a new shopping center and other retail developments.

¶3        In September 2003, the City and Miravista entered into the City of Tempe Marketplace Redevelopment Agreement.  The publically disclosed Redevelopment Agreement provided that (1) Miravista would attempt to acquire all property within the redevelopment area through direct negotiations with the property owners, and if negotiations failed, the City would seek to acquire the property through eminent domain; (2) Miravista, as the owner/operator of the condemned property and improvements, would be solely responsible for all condemnation, relocation, environmental remediation, maintenance, and development expenses; (3) Miravista's obligation to remediate the property within the redevelopment area would not commence until Miravista obtained title to all property within the area; and (4) if Miravista were unable to negotiate a purchase price for property essential to the redevelopment, and if

2

condemnation proceedings were not feasible, Miravista and the City would each have the option of terminating the Redevelopment Agreement.

¶4            In December 2005, fifteen months before LeMad sold the Property, Bradley Wilde, Miravista's manager, faxed a memorandum discussing environmental remediation of LeMad's property to LeMad's legal counsel, Greg Robinson, and attached a copy of Miravista's environmental insurance policy underwritten by American International Group ("AIG").  Wilde's memorandum provided in pertinent part as follows:

> As promised last Friday, enclosed please find a copy of our environmental insurance policy — underwritten by AIG.  I understand that Neil Calfee from the City of Tempe had previously forwarded a copy to Chuck Urban [LeMad's President].
>
> The policy provides coverage for the properties to the western boundary of Mr. Urban's 22 acre landfill.  His property is NOT covered.
>
> Furthermore, as I had mentioned, the EPA has de-listed (from the Superfund) essentially all property (but for a small portion of Mr. Brock's property which contains a well to monitor groundwater) north of Rio Salado Parkway SUBJECT to that property being remediated.  Mr. Urban continues then to be liable to remediate his properties or risk them being relisted as "Superfund" by the EPA.  You may certainly confirm this understanding with Amanda Stone at ADEQ.
>
> Also, as previously mentioned, there is no federal, state or local money earmarked at this time for the remediation of Mr. Urban's landfills or the issues related thereto, including the known methane gas condition.

¶5            In May 2007, LeMad sold the Property to Rio Holdings, a company that Wilde also managed and represented, for $2,327,274 or $2.49 per square foot.  The Property had been appraised in 2005 at $3,754,000, or $4.00 per square foot.

¶6            In July 2009, LeMad's President, Charles Urban, made a request under the Freedom of Information Act for the Housing and Urban Development ("HUD") application and supporting documents for the Tempe Marketplace project.  HUD provided the requested documentation

in October 2010. One of the documents provided was a May 2004 memorandum reflecting that the City of Tempe had requested $7,000,000 in loan funds, with $6,000,000 of the funds committed to environmental cleanup of the Tempe Marketplace site and $1,000,000 to purchase insurance from AIG to cover excess remediation costs, as well as long-term liability insurance against changes in environmental regulations that might result in loss of use of the covered property. The insurance policy was to cover the City, the Tempe Marketplace developers and the "current property owners."

¶7        In April 2012, citing to Wilde's 2005 memorandum and the 2004 HUD memorandum, LeMad brought the underlying action against Appellees for negligent misrepresentation, fraudulent inducement, and violation of the Arizona Consumer Fraud Act. LeMad claimed specifically that it was misled regarding the availability of environmental insurance on the Property. LeMad asserted that it would not have contracted to sell the Property to Rio and River Holdings for the negotiated price if Wilde had not misrepresented the availability of monies for environmental remediation.

¶8        Appellees filed a motion to dismiss under Rule 12(b)(6) of the Arizona Rules of Civil Procedure, asserting that LeMad's complaint failed to state a claim upon which relief could be granted. After considering LeMad's response, the superior court granted the motion to dismiss and made the following findings: (1) Wilde's alleged misrepresentations in his memorandum did not support any of the asserted separate actions; (2) "[a] misrepresentation of law cannot support an actionable fraud claim"; (3) "[t]he alleged misrepresentations were not made in connection with a commercial transaction"; and (4) the Arizona Consumer Fraud Act did not apply to the transaction at issue. The court entered judgment dismissing with prejudice LeMad's complaint in its entirety, and the court subsequently awarded Appellees $24,050 in attorney's fees and $229 in costs.

¶9        LeMad filed a motion for new trial or to alter or amend the judgment, which the superior court denied. The court explained that it had dismissed the complaint with prejudice because (1) the alleged misrepresentations were statements concerning legal conclusions; (2) Wilde's memorandum was not made in connection with a commercial transaction; (3) LeMad was not a purchaser; and (4) LeMad did not properly plead the elements of fraud.

¶10	LeMad timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) and -2101(A)(1).[1]

## DISCUSSION

### I.	Dismissal for Failure to State a Claim.

¶11	LeMad contends that the superior court erred by finding that the complaint failed to state a claim upon which relief could be granted. LeMad argues in particular that (1) Bradley Wilde misrepresented that Miravista's environmental liability insurance policy from AIG did not cover the Property, and (2) Wilde failed to disclose that environmental liability coverage was required under the federal loan obtained by the City (the "Section 108 Loan"). LeMad contends that these misrepresentations (either affirmative or by omission) led the corporation to sell the Property for less than market value and thus supported claims for negligent misrepresentation and fraudulent inducement, as well as consumer fraud.

¶12	We review de novo a dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Coleman v. City of Mesa*, 230 Ariz. 352, 355, ¶ 7, 284 P.3d 863, 866 (2012). We will affirm a dismissal under Rule 12(b)(6) only if the plaintiff "would not be entitled to relief under any interpretation of the facts susceptible of proof." *Id.* at 356, ¶ 8, 284 P.3d at 867 (citation omitted). A complaint must contain "[a] short and plain statement of the claim showing that the pleader is entitled to relief." Ariz. R. Civ. P. 8(a)(2). The purpose of this "notice pleading standard" is to ensure the opponent receives "fair notice of the nature and basis of the claim and . . . generally the type of litigation involved." *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419, ¶ 6, 189 P.3d 344, 346 (2008) (citation omitted). Although we assume all well-pleaded factual allegations to be true and "indulge all reasonable inferences from those facts, [ ] mere conclusory statements are insufficient." *Coleman*, 230 Ariz. at 356, ¶ 9, 284 P.3d at 867. A complaint setting forth legal conclusions, without supporting factual allegations, does not give the opponent proper notice of the basis and nature of the claim, and thus does not satisfy Rule 8's notice pleading requirement. *Cullen*, 218 Ariz. at 419, ¶¶ 6–7, 189 P.3d at 346.

---

[1]	Absent material revisions after the relevant date, we cite to the current version of the statute.

## A.    Negligent Misrepresentation.

¶13    The complaint alleged that Wilde's memorandum to LeMad's counsel negligently misrepresented the scope of environmental insurance coverage Miravista had obtained from AIG.  But Wilde not only sent the memorandum describing Miravista's insurance coverage at the time, he also enclosed a copy of Miravista's insurance policy.  Wilde's memorandum also specifically encouraged LeMad's counsel to draw his own conclusions regarding LeMad's liability for environmental remediation by contacting someone at the Arizona Department of Environmental Quality ("ADEQ").  Thus, Wilde's memorandum's discussion regarding insurance coverage and remediation liability cannot be construed to be a misrepresentation, but rather an explanation of documents and/or information known by or available to LeMad's counsel.

¶14    Citing *Barnes v. Lopez*, 25 Ariz. App. 477, 544 P.2d 694 (1976), LeMad asserts that Wilde's alleged misrepresentations were actionable because they were knowingly misleading.  In *Barnes*, this court upheld a superior court's ruling that a seller and brokerage company were liable for misrepresenting a "condition affecting the property," *i.e.*, the zoning of a particular parcel of land in connection with a real estate transaction.  *Id*. at 478, 544 P.2d at 695.  But unlike the zoning of the property at issue in *Barnes*, the contents of the insurance policy referenced in Wilde's memorandum did not relate to a "condition affecting the property," but rather constituted a statement of the legal effect of an insurance policy, a copy of which was provided to LeMad's counsel.  Moreover, *Barnes* involved an alleged misrepresentation by a seller, and there is nothing in the decision that suggests it would also apply to an alleged misrepresentation by a buyer.

¶15    Furthermore, regardless of any alleged inaccuracies in Wilde's memorandum, LeMad's asserted claim of negligent misrepresentation fails absent an assertion of facts to show that the party making the representation owed a duty to a party who justifiably relied on the statement.  *See Van Buren v. Pima Cmty. Coll. Dist. Bd.*, 113 Ariz. 85, 87, 546 P.2d 821, 823 (1976) (citing the Restatement (Second) of Torts and noting that under *West v. Soto*, 85 Ariz. 255, 336 P.2d 153 (1959), there must be "a duty owed and a breach of that duty before one may be charged with the negligent violation of that duty.").

¶16    Under Section 551(2) of the Restatement (Second) of Torts, a party to a business transaction is under a duty to exercise reasonable care to disclose to the other party,

6

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*See also Van Buren v. Pima Cmty. Coll. Dist. Bd.*, 113 Ariz. 85, 87, 546 P.2d 821, 823 (1976) ("A claim for relief for negligent misrepresentation is one governed by the principles of the law of negligence. Thus, there must be a duty owed and a breach of that duty before one may be charged with the negligent violation of that duty.") (citation omitted).

**¶17** Here, the complaint referenced Wilde's memorandum to LeMad's counsel, in which Wilde stated his belief that the "[P]roperty is NOT covered" under the AIG environmental insurance policy attached to the memorandum. The complaint did not allege, however, any facts from which a fact-finder could conclude that Wilde owed a duty to LeMad or that there was a fiduciary or other special relationship between the parties. Although LeMad suggests that such a duty arose by virtue of the contractual relationship between the parties, there was no contract in place until the parties reached an agreement in 2007. The Restatement expressly disclaims any obligation on the part of a purchaser to educate and inform a seller about his or her own property. Comment k to Section 551 states:

To a considerable extent, sanctioned by the customs and mores of the community, superior information and better business acumen are legitimate advantages, which lead to no

7

liability. The defendant may reasonably expect the plaintiff to make his own investigation, draw his own conclusions and protect himself; and if the plaintiff is indolent, inexperienced or ignorant, or his judgment is bad, or he does not have access to adequate information, the defendant is under no obligation to make good his deficiencies. This is true, in general, when it is the buyer of land or chattels who has the better information and fails to disclose it.

Thus, LeMad has not established any basis for concluding that Wilde or the other Appellees owed LeMad some type of duty at the time Wilde sent the memorandum, and LeMad's negligent misrepresentation claim necessarily fails.

### B.   Fraudulent Inducement.

¶18      LeMad contends that the superior court erred by finding that the corporation did not plead fraud with sufficient particularity and by thus summarily dismissing the fraudulent inducement claim. A fraud claim requires proof of the following elements: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity, (7) the hearer's reliance on its truth; (8) the hearer's right to rely on it; [and] (9) the hearer's consequent and proximate injury." *Comerica Bank v. Mahmoodi*, 224 Ariz. 289, 291–92, ¶ 14, 229 P.3d 1031, 1033–34 (App. 2010).

¶19      Under Rule 9(b) of the Arizona Rules of Civil Procedure, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." "Magic language" is not required when pleading fraud, so long as the complaint, considered as a whole pleads the nine required elements. *Hall v. Romero*, 141 Ariz. 120, 124, 685 P.2d 757, 761 (App. 1984).

¶20      LeMad's fraud claim relies primarily on what the corporation claims was an intentionally incorrect assertion in Wilde's memorandum that there was "no federal, state or local money earmarked at this time for the remediation of Mr. Urban's landfills." LeMad claims that the HUD memorandum contradicts that assertion, but the HUD document does not reference any communications with Appellees and instead discusses planned conduct by the City of Tempe, which is not a party in this matter.

¶21 Furthermore, the HUD memorandum did not reference any money available to land owners, like LeMad, for environmental remediation. Although the HUD memorandum stated that the City of Tempe "has a commitment from American International Group (AIG) to provide insurance that will eliminate [environmental] liability for the existing owners," the HUD memorandum made clear that the City of Tempe was attempting to obtain a *loan* that would have to be repaid and that would be used primarily ($6,000,000) to pay for remediation expenses and secondarily ($1,000,000) to purchase insurance to cover costs exceeding $6,000,000. Because the transaction was expressly characterized as a *loan*, the HUD memorandum did not describe a fund of "free money" earmarked to pay for environmental remediation without cost to, for instance, LeMad.

¶22 Moreover, the HUD memorandum must be read in conjunction with the publically disclosed Redevelopment Agreement, which made clear that the loan-funded insurance policy would cover "current property owners" only after they sold their properties to Miravista. The Redevelopment Agreement specifically provided that remediation efforts would not begin until Miravista and/or the City acquired all necessary properties (by direct purchase or through eminent domain). It further explained that monies to repay the City's HUD loan would come from taxes generated by the proposed development, and that if such taxes were insufficient to repay the loan, the developer would assume the cost of the loan. The HUD memorandum did not suggest that there were available funds for "existing owners" to pay to remediate their properties before the properties were sold or acquired through eminent domain, and instead specifically stated that the referenced insurance "provides one of the strongest incentives for cooperation by the landowners in the redevelopment effort."

¶23 In this context, the only plausible understanding of the HUD memorandum's discussion of insurance for "existing owners" is that the environmental insurance to be provided would cover the current owners after their property had been acquired for redevelopment. Property owners who sell their property may nevertheless be liable for environmental remediation of the property if the damage occurred prior to the sale of the property. *See* 42 U.S.C. § 9607(a) (stating that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" is potentially liable for remediation costs under the Comprehensive Environmental Response, Compensation, and Liability Act). Thus, providing coverage to extinguish ongoing liability for "existing owners" would in fact be a strong incentive for the property owners to sell their property. Accordingly, the HUD

memorandum, read in conjunction with the Redevelopment Agreement, does not support LeMad's claim of a misrepresentation (either negligent or fraudulent) by Wilde or the other Appellees regarding the availability of environmental insurance to pay for remediation expenses incurred by existing property owners before they sold their properties.

¶24        LeMad's reliance on *Rhoads v. Harvey Publications, Inc.*, 131 Ariz. 267, 270–71, 640 P.2d 198, 201–02 (App. 1981), is misplaced. In *Rhoads*, this court held that, although a misrepresentation of law will not support an action for fraud, there is an exception if (1) "the party making the representations is especially skilled in the law and the party to whom the representations are made is not so skilled," or (2) "there exists a relation of trust and confidence between the parties." 131 Ariz. at 270, 640 P.2d at 201. Here, LeMad did not allege facts from which either of those conditions could have been found. Non-lawyer Wilde sent his memorandum to LeMad's counsel, and the relationship between the parties was simply that of a prospective buyer and a prospective seller of real property. Accordingly, given Wilde's role in acting on behalf of a potential buyer, even if LeMad's complaint had connected the alleged obligations under the HUD memorandum to conduct by Appellees, LeMad would not be entitled to relief on this claim.

¶25        Finally, LeMad asserts that the representations at issue "are no different in effect than a putative buyer of a house truthfully telling the seller that the buyer's application for a mortgage sufficient to cover the seller's asking price was denied by a particular lender, and then using that single, truthful 'fact' as leverage to get the seller to lower his asking price — while failing to tell the seller that the buyer had been tentatively approved for the *higher* mortgage amount by a <u>different</u> lender." But LeMad's argument that "[s]haring only half the truth in such a fashion is just as much a fraudulent misrepresentation as an outright lie" ignores the role of the buyer and seller. A home seller (or a corporation interested in selling land) is under no obligation to accept an offer from a buyer, and it would be illogical for a seller to believe it is obligated to sell at a price determined by one prospective buyer's ability to obtain funds. If a seller believes his or her property is worth more than has been offered, there is nothing that prevents the seller from rejecting an offer and waiting to sell to someone willing and able to pay the asking price for the property.

¶26        LeMad's complaint made no assertion that the corporation was forced to sell the Property to Appellees, and LeMad presumably could have declined Appellees' offer and/or sought a higher price from Appellees or through eminent domain proceedings. Notably, LeMad did

not assert in the complaint or on appeal that the Property was not subject to environmental remediation for known conditions on the Property. Instead, LeMad asserted only that those conditions should not have been factored into the sales price for the Property, which was, on its face, an unreasonable assertion. Thus, the superior court did not err by dismissing LeMad's fraudulent misrepresentation claim.

### C. The Arizona Consumer Fraud Act.

¶27 LeMad contends that the Arizona Consumer Fraud Act, A.R.S. § 44-1522, not only provides a cause of action against sellers, but also against purchasers. We conclude otherwise.

¶28 Section 44-1522 provides a private cause of action for misrepresentations, concealment, or omissions of material fact made "in connection with the sale or advertisement of merchandise." *Dunlap v. Jimmy GMC*, 136 Ariz. 338, 342, 666 P.2d 83, 87 (App. 1983) (stating that the Act "provides an injured consumer with an implied private cause of action against a violator of the act"). "Merchandise" is defined as including real estate. A.R.S. § 44-1521(5).

¶29 "The clear intent of this provision is to protect unwary buyers from unscrupulous sellers." *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992). The Act provides a remedy for injured consumers "to counteract the disproportionate bargaining power often present in consumer transactions." *Waste Mfg. & Leasing Corp. v. Hambicki*, 183 Ariz. 84, 88, 900 P.2d 1220, 1224 (App. 1995). Because LeMad was the seller, not the purchaser or buyer of the Property, the superior court did not err by summarily dismissing LeMad's Consumer Fraud Act claim.

### D. Motion for New Trial/Motion to Amend.

¶30 We review the superior court's denial of a motion for new trial or to amend a complaint for an abuse of discretion. *Pullen v. Pullen*, 223 Ariz. 293, 296, ¶ 10, 222 P.3d 909, 912 (App. 2009). The party seeking to overturn the decision bears the burden of proving that the court abused its discretion. *Id.*

¶31 LeMad's motion for new trial did not detail any evidence or information the superior court failed to consider. Accordingly, and because we agree with the superior court's ruling dismissing LeMad's complaint, we conclude that the court did not abuse its discretion by denying LeMad's motion for new trial.

**¶32** In seeking leave to amend, LeMad did not provide the superior court with a copy of a proposed amended pleading and thus failed to comply with Arizona Rule of Civil Procedure 15(a)(2). Thus, there was no basis from which the superior court could have assessed whether permitting amendment would have been futile. *See Tumacacori Mission Land Dev., Ltd. v. Union Pac. R.R. Co.*, 231 Ariz. 517, 519, ¶ 4, 297 P.3d 923, 925 (App. 2013). Accordingly, the superior court did not abuse its discretion by denying LeMad's motion to amend its complaint.

## II. Attorney's Fees & Costs.

**¶33** Both parties have requested an award of attorney's fees on appeal pursuant to A.R.S. § 12-341.01(A). In an exercise of our discretion, we award Appellees their reasonable attorney's fees as the prevailing parties on appeal upon compliance with ARCAP 21. As the prevailing parties on appeal, Appellees are also entitled to their costs on appeal upon compliance with ARCAP 21. LeMad's request for fees and costs is denied.

## CONCLUSION

**¶34** For the foregoing reasons, we affirm the superior court's dismissal of LeMad's complaint and its denial of LeMad's motion for new trial.



Ruth A. Willingham · Clerk of the Court
FILED: gsh